**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

OTG MANAGEMENT PHL LLC;        :

OTG MANAGEMENT PHL B, LLC;       :

LAGUARDIA USA LLC;        :   Case No.: _____

LGA AIRPORT RESTAURANTS, L.P.;   :   JURY TRIAL DEMANDED

OTG DCA VENTURE II LLC;       :

OTG JFK T2 VENTURE, LLC;      :

OTG JFK T5 VENTURE, LLC;      :

OTG MANAGEMENT T8 LLC;      :

OTG MANAGEMENT JFK LLC;     :

OTG MANAGEMENT EWR LLC;    :

OTG MANAGEMENT IAH, LLC;     :

OTG MANAGEMENT MIDWEST LLC;  :

OTG MANAGEMENT YYZ, LLC;    :

OTG MCO VENTURE II LLC;     :

OTG ORD VENTURE LLC;       :

OTG EXPERIENCE, LLC;        :

OTG CONCEPTS FRANCHISING, LLC; AND :

OTG MANAGEMENT LLC;        :

      Plaintiffs,          :

v.                      :

EMPLOYERS INSURANCE COMPANY OF  :
WAUSAU,                  :

      Defendant.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

The plaintiffs ("Plaintiffs") file this Complaint against the defendant, Employers Insurance Company of Wausau ("Liberty"), seeking declaratory and equitable relief and damages for breach of contract and bad faith, alleging the following:

1.     This action arises out of Liberty's failure to meet its obligations under an "all risks" insurance policy covering, among other things, business interruption that the defendant sold to cover Plaintiffs.

2.     Plaintiffs paid substantial premiums to purchase an all-risk insurance policy to cover all risks of physical loss or damage. Now that Plaintiffs suffered losses resulting from covered risks, Liberty has improperly denied Plaintiffs the benefit of coverage that was previously bargained for and that Plaintiffs reasonably expected. This Court should enforce the promise Liberty made and require it to provide the coverage Plaintiffs purchased.

3.     Under established principles of insurance law, Plaintiffs are entitled to payment under the policy for multi-million dollar business income losses and expenses covered under the policy.

## I.     PARTIES

4.     Plaintiffs operate and manage airport concessions in airports across the United States. In particular, they operate restaurants, bars, and markets providing food and beverage services, as well as other airport retail concession businesses.

5.     Plaintiffs OTG Management PHL LLC and OTG Management PHL B, LLC are limited liability companies that are responsible for and operate sites at Philadelphia International Airport (PHL) in Philadelphia, Pennsylvania. They were formed in Delaware.

6.     Plaintiffs LaGuardia USA LLC and LGA Airport Restaurants, L.P. are a limited liability company and a limited partnership that are or were responsible for and operate or

2

operated sites at LaGuardia Airport (LGA) in New York, New York. LaGuardia USA LLC was formed in New York LGA Airport Restaurants, L.P.'s partners are located in California and Pennsylvania.

7.      Plaintiff OTG DCA Venture II LLC is a limited liability company that is responsible for and operates sites at Reagan National Airport (DCA) in Arlington, Virginia. It was formed in Delaware.

8.      Plaintiff OTG JFK T2 Venture, LLC, OTG JFK T5 Venture, LLC, and OTG Management T8 LLC are limited liability companies that are responsible for and operate sites at John F. Kennedy International Airport (JFK) in New York, New York. They were each formed in Delaware.

9.      Plaintiff OTG Management JFK LLC is a limited liability company that is also responsible for and operates sites at JFK. It was formed in New York.

10.      Plaintiff OTG Management EWR LLC is a limited liability company that is responsible for and operates sites at Newark Liberty International Airport (EWR) in Newark, New Jersey and regularly conducts business in Newark, New Jersey. It was formed in Delaware.

11.      Plaintiff OTG Management IAH, LLC is a limited liability company that is responsible for and operates sites at George Bush Intercontinental Airport (IAH) in Houston, Texas. It was formed in Delaware.

12.      Plaintiff OTG Management Midwest LLC is a limited liability company that is responsible for and operates sites at Minneapolis-Saint Paul International Airport (MSP) in St. Paul, Minnesota. It was formed in Delaware.

13.     Plaintiff OTG Management YYZ, LLC is a limited liability company that is responsible for and operates sites at Toronto Pearson International Airport (YYZ) in Ontario, Canada. It was formed in Delaware.

14.     Plaintiff OTG MCO Venture II LLC (Series B) is a limited liability company that is responsible for and operates sites at Orlando International Airport (MCO) in Orlando, Florida. It was formed in Delaware.

15.     Plaintiff OTG ORD Venture LLC is a limited liability company that is responsible for and operates sites at Chicago O'Hare International Airport (ORD) in Chicago, Illinois. It was formed in Delaware.

16.     Plaintiff OTG Experience, LLC is a limited liability company that develops and licenses restaurant and other airport retail concession concepts and related intellectual property. It was formed in Delaware.

17.     Plaintiff OTG Concepts Franchising, LLC is a limited liability company that franchises certain restaurant concepts to third parties. It was formed in Delaware.

18.     Plaintiff OTG Management LLC is the ultimate parent company of the entities identified above. The airports at which Plaintiffs operate—PHL, LGA, JFK, EWR, DCA, IAH, MSP, MCO, ORD, and YYZ—are referred to as the Airports. It was formed in Delaware.

19.     The members of the LLCs identified in the preceding paragraphs are located in New Jersey, New York, Delaware, Florida, Illinois, Minnesota, Pennsylvania, Texas, and Washington, D.C.

20.     Defendant Employers Insurance Company of Wausau is an insurance company incorporated in Wisconsin with its principal place of business in Massachusetts and is a

subsidiary of Liberty Mutual Holding Company. In this complaint, the defendant is referred to as Liberty.

## II.      JURISDICTION AND VENUE

21.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

22.     This Court has personal jurisdiction over Liberty because Liberty contracted to insure Plaintiffs in New Jersey and to insure Plaintiffs' property and Plaintiffs' risks in New Jersey and regularly conducts business in New Jersey.

23.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) as a substantial portion of the events or omissions giving rise to OTG's claim occurred and continue to occur in this District and a substantial part of property that is the subject of this action is situated in this District.

## III.     FACTUAL BACKGROUND

### A.      The Policy

24.     Liberty sold an insurance policy (the "Policy") to OTG Management covering "all risks of direct physical loss or damage." See Ex. A.

25.     The Policy covers OTG Management and "any subsidiary," which includes the entities identified in paragraphs 5 through 17 above.

26.     The Policy has an effective term date of June 1, 2019 through June 1, 2020 at 12:01am, local time.

27.     Liberty drafted the Policy.

28.     Plaintiffs had no input in drafting the language of the Policy.

29.     Plaintiffs paid a substantial premium of about $550,000 for this type of insurance. Liberty calculated Plaintiffs' business interruption premiums based in material part on the revenue Liberty expected Plaintiffs to generate as fully functioning and operational businesses.

30.     Plaintiffs have suffered direct physical loss of and damage to their insured properties and business interruption and other losses covered under the Policy.

**B.      COVID-19 Pandemic**

31.     SARS-CoV-2 causes COVID-19, a disease that attacks the respiratory system and causes other harm to humans. SARS-CoV-2 and COVID-19 are collectively referred to herein as COVID-19.

32.     COVID-19 is deadly and highly contagious.

33.     On January 30, 2020, the World Health Organization (WHO) declared the COVID-19 outbreak a Public Health Emergency of International Concern.

34.     On March 11, 2020, the WHO declared COVID-19 to be a pandemic.

35.     A pandemic is an outbreak of a disease that affects a wide geographic area and infects an exceptionally high proportion of the population.

36.     On March 13, 2020, the President of the United States declared a nationwide emergency in response to COVID-19.

37.     According to the WHO, COVID-19 has infected over 86,000,000 people and caused more than 1,880,000 deaths.

38.     According to the Centers for Disease Control and Prevention (CDC), COVID-19 has infected over 21,000,000 people and caused more than 359,000 deaths in the United States.

39.     The CDC estimated that infection rates for COVID-19 are likely at least ten times higher than reported for March 2020 through May 2020. See Ex. B

(https://www.cdc.gov/media/releases/2020/s0722-SARS-CoV-2-infections.html (last viewed Jan. 8, 2021)).

### C.      COVID-19 Is a Risk That Causes Physical Loss Or Damage

40.      COVID-19 causes physical loss and damage to property, and causes a physical, tangible alteration to property.

41.      COVID-19 can spread in several ways, including from person to person, through respiratory droplets, through airborne transmission, or by contact with objects or surfaces that have been damaged by, or whose value, usefulness, or normal function has been seriously impaired or detrimentally altered by, COVID-19. See Ex. C (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last viewed Jan. 8, 2021)).

42.      Airborne transmission involves exposure to COVID-19 "in small droplets and particles that can linger in the air for minutes to hours" and can result in infecting individuals "who are further than 6 feet away from the person who is infected or after that person has left the space." *Id*.

43.      According to a CDC study published in July 2020, "droplet transmission was prompted by air-conditioned ventilation" that caused an outbreak among people who dined in the same air-conditioned restaurant. See Ex. D (https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last viewed Jan. 8, 2021)).

44.      The WHO has confirmed that COVID-19 can remain viable on objects or surfaces. See Ex. E (https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last viewed Jan. 8, 2021)); Ex. F (https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html (last viewed Jan. 8, 2021)).

45.     Based on (a) a study from National Institutes of Health, CDC, University of California at Los Angeles, and Princeton University scientists in the New England Journal of Medicine, (b) a study by the Commonwealth Scientific and Industrial Research Organisation (CSIRO), (c) a study in the Journal of Hospital Infection, and (d) a CDC report on Public Health Responses to COVID-19 Outbreaks, COVID-19 can remain viable on various objects, surfaces, or materials for a period of up to 28 days. See Ex. G (https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last viewed Jan. 8, 2021)); Ex. H (https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last viewed Jan. 8, 2021)); Ex. I (https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last viewed Jan. 8, 2021)); Ex. J (https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last viewed Jan. 8, 2021)).

46.     Plaintiffs' properties contain such surfaces, objects, and materials, which Plaintiffs used in their ordinary course of business.

47.     COVID-19 can exist on such surfaces, objects, and materials, called "fomites" by some in the scientific community, and serve as vehicles in transmission. See Ex. K (https://aem.asm.org/content/73/6/1687 (last viewed Jan. 8, 2021)).

48.     During and after illness, COVID-19 particles are shed in large numbers in bodily secretions, including saliva, oral and nasal fluid, respiratory droplets, blood, feces, and urine particles. *Id*.

49.     COVID-19 can be introduced to surfaces by direct physical contact with such particles, contact with soiled hands, shoes, or clothing, contact with aerosolized COVID-19 (large droplet spread) released while breathing, talking, sneezing, or coughing, or contact with

airborne COVID-19 that settles after disturbance of a surface damaged by COVID-19 (e.g., shaking a tablecloth at a restaurant). *Id*.

50.     Once an object or surface is detrimentally affected, impaired, altered, or damaged by COVID-19 transfer of COVID-19 may readily occur between inanimate and animate objects, or vice versa, and between two separate surfaces. *Id*.

51.     Individuals can become infected with COVID-19 by contacting surfaces or objects detrimentally affected, impaired, altered, or damaged by COVID-19 or through airborne transmission after the infected person was present. See Ex. F (https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html (last viewed, Jan. 8, 2021)).

52.     COVID-19—both its presence and the prospect of its presence—is a risk of direct physical loss or damage and causes physical loss or damage to property.

53.     It physically harms property, causes a physical, tangible alteration, and seriously and detrimentally affects, impairs, damages, or alters its value, usefulness, or normal function, rendering the property nonfunctional for its normal occupancy or use.

54.     The presence of COVID-19 physically alters property and its existence on objects or surfaces renders them unsafe or unusable for their normal use.

55.     The presence of COVID-19, a noxious substance, in the air at a property renders the property unusable, uninhabitable, or unfit for its normal occupancy or use.

56.     COVID-19 has caused physical loss or damage at Plaintiffs' locations and property and the Airports and is a risk of physical loss or damage to the Airports and Plaintiffs' locations and property.

**D.      COVID-19 At The Airports**

57.      Plaintiffs employed more than 5,000 individuals before COVID-19 began spreading throughout the United States. There have been hundreds of employees with suspected or confirmed COVID-19 infections or that have been exposed to individuals with suspected or confirmed COVID-19 infections.

58.      It is more probable than not that more of Plaintiffs' employees have had COVID-19 in addition to those that have reported suspected or confirmed cases. As referenced above, the CDC estimated that infection rates for COVID-19 were likely at least ten times higher than reported for March 2020 through May 2020.

59.      The Airports are highly trafficked locations, including by individuals from various locations who have just spent hours in a confined location with many other individuals.

60.      The CDC estimates that there were approximately 91,000,000 infections in the United States from February 2020 through September 2020, approximately 77,000,000 symptomatic infections and 14,000,000 asymptomatic infections. See Ex. L (https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/burden.html (last viewed Jan. 8, 2021)).

61.      According to the United States Census Bureau, the population of the United States during that time period was about 330,000,000. See Ex. M (https://www.census.gov/popclock/).

62.      Thus, based on the CDC estimate, 27.5% of the population was infected during that time period, approximately 23.3% of which were symptomatic and 4.2% of which were asymptomatic.

63.      During that time period, an estimated 42,360,316 people traveled through the Airports.

64.     Applying the CDC estimates summarized above, 11,649,086 people with COVID infections traveled through the Airports from February 2020 through September 2020, about 9,869,952 of which were symptomatic and 1,779,134 of which were asymptomatic.

65.     As of January 8, 2021, the Transportation and Security Agency (TSA) has had 5,474 federal employees test positive for COVID-19. That figure includes: 39 federal employees at DCA; 192 federal employees at EWR; 119 federal employees at IAH; 228 federal employees at JFK; 70 federal employees at LGA; 139 federal employees at MCO; 56 federal employees at MSP; 221 federal employees at ORD; and 112 federal employees at PHL. See Ex. N (https://www.tsa.gov/coronavirus (last viewed Jan. 8, 2021)). It is more likely than not that the TSA's employees have had COVID-19 in addition to those that have reported suspected or confirmed cases.

66.     Upon information and belief, numerous flights to or from YYZ carrying passengers with COVID-19 arrived at or departed from YYZ during the period relevant to OTG's claim.

67.     The ubiquitous nature of the pandemic further confirms that COVID-19 was and is present at the Airports and at Plaintiffs' locations.

68.     COVID was in the air and on the walls, floors, and any other surface where it landed after being emitted or otherwise released by an infected individual at the Airports and at Plaintiffs' locations.

69.     COVID-19 has been and continues to be present at the Airports and at Plaintiffs' locations. It has caused physical loss or damage at the Airports and Plaintiffs' locations and property and is a risk of physical loss or damage to the Airports and Plaintiffs' locations and property.

E.     OTG's "All Risks" Policy

70.     To insure against losses from unexpected and unprecedented circumstances like these, OTG Management had purchased business interruption coverage as part of an all-risk commercial property insurance policy from Liberty.

71.     The Policy covers property "against all risks of direct physical loss or damage."

72.     The Policy included business interruption coverage (also known as "Time Element" coverage), which insures against the loss of business income and extra expense sustained as a result of "direct physical loss or damage to" insured property.

73.     The property includes those locations listed in Appendix A of the policy, which includes the Airports and property at those airports.

74.     OTG Management YYZ, LLC has a local policy that it reasonably expects to exhaust due to losses that would also be covered under the Policy.

75.     The presence of COVID-19 is a "risk of direct physical loss or damage."

   a.   Paragraphs 40 through 56 above support that the presence of COVID-19 is a risk of physical loss or damage.

   b.   Liberty asked Plaintiffs whether any of their locations had been exposed to someone with COVID-19. Liberty's inquiry acknowledges that (a) the presence of someone with COVID-19 shows that COVID-19 was present and (b) COVID-19 is a "risk of physical loss or damage" that is not excluded or limited by the policy. Otherwise, there would have been no reason for Liberty to ask whether any of its locations had been exposed to someone with COVID-19.

   c.   COVID-19 has been and continues to be present at the Airports and at Plaintiffs' locations.

12

76.   In addition, "actions" "necessary due to actual, or to prevent impending threat of physical loss or damage of the type covered by this Policy" are another "risk of physical loss or damage" that is not excluded or limited.

    a.   The Policy states that Liberty provides "PROPERTY DAMAGE COVERAGES AND LIMITATIONS for a covered loss . . . ." The Policy defines covered loss as "A loss to covered property caused by direct physical loss or damage insured by this Policy."

    b.   One of the property damage coverages is "PROTECTION AND PRESERVATION OF PROPERTY", which covers "reasonable and necessary costs to temporarily protect or preserve covered property provided such actions are necessary due to actual, or to prevent immediately impending threat of, physical loss or damage of the type covered by this Policy to such covered property."

    c.   Thus, the Policy expressly recognizes that "actions [that] are necessary due to actual, or to prevent immediately impending threat of, physical loss or damage of the type covered by this Policy to such covered property" are covered property damage.

    d.   Plaintiffs and government entities, through various government orders prohibiting or limiting in-person dining at restaurants, took action "to prevent impending threat of physical loss or damage of the type covered," *i.e.* the presence of COVID-19—which again is a "risk of physical loss or damage" that is not excluded or limited—at the Airports and Plaintiffs' locations.

77.     In addition, or alternatively, various government orders are a "risk of physical loss or damage" that is not excluded or limited.

    a.   The various government-issued orders prohibited or limited in-person dining at restaurants.

    b.   The various government orders minimized the spread of COVID-19 both through airborne transmission and contaminated surfaces.

    c.   Separately, because those government orders resulted in a deprivation of Plaintiffs' property and loss of use of such property, they are a "risk of physical loss or damage."

78.     The Policy contains numerous different coverage parts, many of which provide coverage.

79.     The majority of the coverage parts are not mutually exclusive and where a particular coverage part is intended to be exclusive the Policy specifies that accordingly.

80.     Thus, a policyholder's loss may trigger several different coverage parts and provide multiple pathways to coverage under the Policy.

81.     Plaintiffs paid a substantial premium for this broad insurance coverage and reasonably expected coverage for the losses described in this Complaint.

82.     Plaintiffs have incurred substantial covered loss and expense as a result of the risks of physical loss or damage identified above. The coverages triggered include the following.

    **1.     Time Element Coverage**

83.     Plaintiffs have sustained loss "directly resulting from a loss of the type insured" to covered property used by Plaintiffs during the applicable period of liability.

84.     The "loss of the type insured" includes those identified in paragraphs 75 through 77.

### 2.   Attraction Property Coverage

85.     Plaintiffs have sustained loss and extra expense "resulting from loss or damage of the type insured by this Policy to property of the type insured at" a property within one mile of Plaintiffs' locations that is "operated by others" that Plaintiffs "depend on to attract customers to [their] covered location."

86.     The "loss or damage of the type insured" includes those identified in paragraphs 75 through 77. That loss or damage occurred at Airports, Airport terminals, and other businesses within one mile of Plaintiffs' locations that Plaintiffs do not operate but depend on to attract customers to their locations.

### 3.   Civil or Military Authority Coverage

87.     Plaintiffs have sustained loss and extra expense "during the period of interruption if an order of civil or military authority prohibits access to a covered location provided such order is caused by physical loss or damage of the type insured by this Policy at a covered location" or within one mile of a covered location.

88.     The orders of civil or military authority were caused by "physical loss or damage of the type insured," including that identified in paragraphs 75 & 76. In particular, they were caused by the need to prevent and limit the spread of COVID-19, which includes preventing limiting the damage and loss COVID-19 causes to property, particularly given that such damage and loss can lead to individuals becoming infected with COVID-19 and dying, as well as business interruption and extra expense.

### 4.   Civil or Military Authority Coverage (Imminent Threat)

89.     Plaintiffs have sustained loss and extra expense "during the period of interruption if an order of civil or military authority prohibits access to a covered location provided such order is caused by physical loss or damage of the type insured by this Policy, or imminent threat

of physical loss or damage of the type insured by this Policy, at a covered location" or within one mile of a covered location.

90.     The order of civil or military authority were caused by the "imminent threat of physical loss or damage of the type insured," including that identified in paragraphs 75 & 76. In particular, they were caused by the desire to prevent and limit the spread of COVID-19, which includes preventing limiting the physical damage and loss COVID-19 causes to property, particularly given that such damage and loss can lead to individuals becoming infected with COVID-19, as well as business interruption and extra expense.

### 5.     Contingent Time Element Coverage

91.     Plaintiffs have sustained loss and extra expense "during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured by this Policy at" "[a]ny location(s) of a direct: customer, supplier, contract manufacturer or contract service provider to [Plaintiffs]" or "[a]ny location(s) of a company that is a direct: customer, supplier, contract manufacturer or contract service provider to" any of those previously listed entities.

92.     The "physical loss or damage of the type insured" includes those identified in paragraphs 75 through 77.

### 6.     Ingress / Egress Coverage

93.     Plaintiffs have sustained loss and extra expense due to the necessary interruption of business because "ingress to or egress from a covered location" was prevented as "a direct result of physical loss or damage of the type insured to property of the type insured."

94.     The "physical loss or damage of the type insured" includes those identified in paragraphs 75 through 77.

95.     The various government orders prevented ingress to and egress from covered locations and were issued as a direct result of physical loss or damage of the type insured to property of the type insured. See paragraph 88.

### 7.     Difference in Conditions/Difference in Limits Coverage

96.     Plaintiff OTG Management YYZ, LLC has sustained physical loss or damage to covered property in a foreign location where there is a local policy that applies at that foreign location.

97.     Due to differences in conditions in the local policy, the local policy does not provide coverage for all loss or damage suffered at YYZ that would be covered under the Policy.

98.     Due to differences in limits in the local policy, the local policy provides coverage for only part of the same loss or damage as the Policy would cover. The local policy will exhaust its limits of liability at a lower amount than the "LIMIT(S) OF LIABILITY" in the Policy would cover.

### 8.     No Exclusions Bar Coverage

99.     Plaintiffs' losses and expenses, and coverage for such losses and expenses, are not excluded by the Policy.

100.     If Liberty wanted to exclude coverage for loss or damage caused directly or indirectly by a virus, it could have used an exclusion that clearly and unambiguously did so.

101.     Other companies in the Liberty family use such exclusions in other policies.

102.     For example, one Liberty company used the following exclusion in its policy:

> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.
>
> . . .

j. Virus Or Bacteria

(1) Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

. . .

See Ex. O at paragraph 82.

103.    The "Contamination" exclusion does not apply. The amounts for which Plaintiffs seek coverage are covered under the time element section of the Policy, and the contamination exclusion does not apply to that section of the Policy. In addition, even if it applied to that section of the Policy, the exclusion provides that the Policy does not "cover" "Contamination, and any cost due to contamination." Plaintiffs are not asking Liberty to "cover" "contamination." Plaintiffs seek coverage for losses and expenses.

104.    In addition, on information and belief, when seeking regulatory approval for the Contamination exclusion, Liberty and other insurers represented to insurance regulators that property policies had not been a source of recovery for losses involving contamination by disease-causing agents. Therefore, the proposed exclusion was allegedly clarifying the coverage already provided and was purportedly not a reduction in coverage. However, because those policies had in fact been a source of recovery for that type of loss and because the proposed exclusion is a reduction in coverage (under Liberty's position), such a representation would have been a misrepresentation. Under the equitable doctrine of estoppel and regulatory estoppel, Liberty is estopped from asserting an interpretation of a policy in court which is contrary to Liberty's original representations and explanation of the policy's coverage when it obtained state regulatory approval of the policy. As a result, the Contamination exclusion does not apply for

this additional reason and the policy provides coverage for the losses described in this Complaint.

105.    The law or ordinance exclusion does not apply. To the extent Plaintiffs' losses or damages are from executive branch government orders, those are not "laws or ordinances." Even if they were, no such law or ordinance was "enforced" on OTG. In addition, the meaning of the word "use" as used in the exclusion is not clear. And, as an alternative matter, Plaintiffs' losses or damages are not from executive branch orders.

**F.    Liberty's Denial of The Claim**

106.    Plaintiffs turned to Liberty, reasonably expecting that Liberty would cover their losses and expenses as described in this Complaint.

107.    On March 16, 2020, Liberty received a timely notice of loss from Plaintiffs that detailed the losses described herein and requested coverage.

108.    On March 18, 2020, Liberty responded through a claims representative seeking additional information. Liberty asked (a) "Are all closures due to government order?" and (b) "Are any of these locations known to have been exposure to someone with COVID-19"? Liberty asked both of these questions despite its intention to deny coverage regardless of the answers to those questions.

109.    On March 20, 2020, Liberty sent an email asking the same questions. Liberty provided no explanation for why it deemed it necessary to follow up 48 hours after it initially asked those questions.

110.    On April 15, 2020, Liberty sent a letter stating that Liberty had attempted to reach Plaintiffs on four prior occasions. There was no reason to reference those dates except to unreasonably attempt to create a paper trail to paint the incorrect picture that Liberty was investigating the claim and evaluating coverage in good faith and that Plaintiffs were delaying.

That was particularly true since no matter what information Plaintiffs provided about their COVID-related losses, Liberty intended to deny coverage.

111.    The April 15, 2020 letter stated Liberty was "issuing a Reservation of Rights." The letter did not reserve Liberty's rights to exclude coverage based on the argument that COVID-19 was not a "risk of physical loss or damage." Nor did the letter reserve Liberty's rights to exclude coverage based on the argument that the law or ordinance exclusion barred coverage.

112.    By failing to include such rights in its purported reservation of rights letter, Liberty waived such rights.

113.    On April 17, 2020, Liberty asked the same two questions in its March 18 email.

114.    On June 26, 2020, Plaintiffs responded to Liberty, answering all of Liberty's questions.

115.    Liberty then engaged in unreasonable delay and obfuscation, further revealing that its prior repeated inquiries were not genuine and were only meant to paint an inaccurate picture of the claim, including that Liberty was investigating the claim and evaluating coverage in good faith (it was not).

116.    On August 7, 2020, Plaintiffs asked when Liberty expected to provide a response. Liberty refused to provide an actual answer, instead just stating that it had "referred your letter to our legal council [sic] to review and respond."

117.    On August 13, 2020, Plaintiffs asked when they could expect a substantive response. Liberty again refused to provide an actual answer, instead just stating that it would "be forthcoming in short order."

118.     On August 27, 2020, Liberty still had not responded and Plaintiffs again asked when they could expect Liberty's confirmation of coverage. On September 1, Liberty responded that "our legal council [sic] is expecting to complete our response by weeks end."

119.     Despite this representation, Liberty did not respond by "weeks end"—i.e., September 4. On September 8, 2020, Plaintiffs followed up again asking when it would receive Liberty's response. Liberty did not respond.

120.     On September 15, 2020, Plaintiffs again followed up asking for Liberty's response.

121.     On September 16, 2020 (although the letter was incorrectly dated September 14, 2020), Liberty finally responded. Despite asking (a) where "all closures due to government order" and (b) whether "any of these locations known to have been exposure to someone with COVID-19," Liberty denied coverage contending there was no coverage even if closures were due to government order or if locations were known to have been exposed to someone with COVID-19. Liberty appeared to argue that COVID-19 was not a "risk of physical loss or damage," that there was no physical loss or damage to Plaintiffs' property, and that the law or ordinance exclusion barred coverage even though it had failed to raise those issues in its April 15 reservation of rights letter.

122.     Plaintiffs performed all of their obligations under the Policy, including by notifying Liberty of a covered cause of loss under the agreement, and any conditions precedent have occurred or been satisfied, met, waived, excused, or are otherwise inapplicable.

123.     Liberty's denial of coverage for Plaintiffs' claim is improper and its failure to provide coverage is a breach of the Policy.

124.     Liberty's conduct during its handling of Plaintiffs' claim constituted bad faith.

125.    Liberty's conduct during its handling of Plaintiffs' claim constituted a violation of the New Jersey Consumer Fraud Act.

## IV.    CAUSES OF ACTION

### COUNT I (Declaratory Judgment)

126.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

127.    Plaintiffs seek the Court's declaration of the parties' rights and duties under the Policy pursuant to 28 U.S.C. § 2201.

128.    A justiciable controversy exists between Plaintiffs and Liberty concerning the availability and amount of coverage under the Policy for Plaintiffs' claims.

129.    The controversy between Plaintiffs and Liberty is ripe for judicial review.

### COUNT II (Breach of Contract)

130.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

131.    The Policy is a valid and enforceable contract between Plaintiffs and Liberty.

132.    Plaintiffs complied with all applicable Policy provisions or Liberty waived those provisions or is estopped from asserting any purported non-compliance with those provisions.

133.    Liberty breached the Policy by improperly denying coverage to Plaintiffs or otherwise repudiating its obligation to cover Plaintiffs' losses and expenses, as expressly required under the Policy.

134.    Plaintiffs have sustained and continue to sustain damages as a result of Liberty's breach of the Policy.

### COUNT III (Bad Faith)

135.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

136.    Liberty acted in bad faith both in its refusal to provide coverage and in its handling of Plaintiffs' claims.

137.     Liberty did not have a reasonable basis for denying coverage and Liberty knew or recklessly disregarded its lack of reasonable basis in denying the claim.

138.     Liberty cannot fairly debate that Plaintiffs are entitled to coverage for the claims at issue based on their investigation.

139.     Liberty had no valid reasons to delay processing the claim or to request that Plaintiffs comply with burdensome information requests while planning to deny coverage from the moment it received the claims.

140.     At the outset, Liberty's initial reaction to Plaintiffs' claims was to press Plaintiffs to respond to premature information requests in an attempt to create time-consuming and costly work to dissuade Plaintiffs from pursuing their claim and to paint an inaccurate picture that Plaintiffs were somehow delaying and that Liberty was investigating the claim and evaluating coverage in good faith. The unreasonable nature of those tactics is further demonstrated by the fact that, because Liberty denies that the presence of COVID-19 amounts to physical loss or damage, Liberty intended to deny coverage regardless of Plaintiffs' responses to those inquiries. For example, Liberty asked whether any individuals infected with COVID had been at covered locations even though Liberty planned to deny coverage regardless of whether any such individuals had or had not been present. Liberty then unreasonably stalled and delayed its response to Plaintiffs' reply to Liberty's inquiries. In that response, Liberty unreasonably denied coverage despite Plaintiffs' responses. Liberty's actions lacked a reasonable basis and Liberty knew or recklessly disregarded its lack of reasonable basis in denying the claim.

141.     Plaintiffs have suffered and continue to suffer damages as a result of Liberty's bad faith.

**COUNT IV (Violation of New Jersey Consumer Fraud Act – N.J.S.A. 56:8-2)**

142.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

143.    While investigating the claim, Liberty persisted in demanding the production of information from Plaintiffs and that Plaintiffs answer questions from Liberty.

144.    Liberty intended for Plaintiffs to rely on those questions asked and information requested as evidence that Liberty was properly investigating the claim and that supplying the requested information could help establish coverage.

145.    However, Liberty already had a pre-formed intent of denying the claim, regardless of what information was contained in Plaintiffs' answers, as evidenced by Liberty's refusal to provide coverage as described in this Complaint.

146.    In addition, the information Liberty demanded included information that, based on Liberty's positions, was not reasonably required for or material to the resolution of Plaintiffs' claim for coverage, contrary to what Liberty led Plaintiffs to believe.

147.    Through that conduct and the conduct described more fully in paragraphs 106 to 125, Liberty engaged in an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of material facts and, upon information and belief, did so with the intent that Plaintiffs rely upon such concealment, suppression or omission, in connection with Liberty's performance under the Policy.

148.    Liberty's conduct in its investigation of the claim violated the New Jersey Consumer Fraud Act.

149.    Plaintiffs are entitled to an award of damages under the New Jersey Consumer Fraud Act as a result of Liberty's investigation in an amount to be determined at trial, including attorney's

fees, pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

**V.    PRAYER FOR RELIEF**

150.    Wherefore, the Plaintiffs request judgment against Liberty as follows:

a.    A declaration from the Court that (a) the various coverage provisions identified herein are triggered by Plaintiffs' claims; (b) the Policy covers Plaintiffs' claims; (c) Plaintiffs sustained direct physical loss or damage from a covered cause of loss under the parties' agreement; (d) Liberty waived its positions, including that COVID-19 was not a risk of physical loss or damage, that COVID-19 does not cause physical loss or damage, and that the law or ordinance exclusion barred coverage; (e) no exclusion applies to bar or limit coverage for Plaintiffs' claims; (f) Liberty is estopped from asserting an interpretation of the Policy in court that is contrary to Liberty's original representations and explanation of the policy when it obtained state regulatory approval of the Policy; and (g) any other declaratory relief useful to resolving the dispute between the parties and Plaintiffs seek an order requiring Liberty to provide coverage for Plaintiffs' claims;

b.    An order requiring Liberty to provide coverage for the Plaintiffs' claims;

c.    For damages, including actual, compensatory, consequential, special, exemplary, and punitive, against Liberty in an amount to be proved at trial in excess of $75,000.00;

d.    Pre-judgment, post-judgment, and statutory interest;

e.    An award of attorney's fees and costs of suit incurred; and

f.    For such other and further relief, including any equitable relief, as the Court deems just and proper.

Dated: January 27, 2021        Respectfully submitted,

/s/ Kevin V. Small
Kevin V. Small (NJ Bar No. 073422013)
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, NY 10166
Tel: (222) 309-1226
Fax: (212) 309-1100
ksmall@huntonak.com

Sergio Oehninger (*pro hac vice* application to be filed)
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue, NW
Washington, DC 20037
202-955-1854
soehninger@hunton.com

Patrick McDermott *(pro hac vice* application to be filed)
**HUNTON ANDREWS KURTH LLP**
951 East Byrd Street
Richmond, VA 23219
804-788-8707
pmcdermott@hunton.com

*Attorneys for Plaintiffs*