**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

OTG MANAGEMENT PHL LLC, *et al.*,

          *Plaintiff*,

    v.

EMPLOYERS INSURANCE COMPANY OF
WAUSAU,

          *Defendant*.

Civil Action No. 2:21-cv-01240-WJM-MF

**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ................................................................. 1

II. WELL-PLEADED FACTS ..................................................................... 3

    A. The Policy Covers "All Risks of Direct Physical Loss or Damage" ................ 3

        1. The Time Element Sections Cover OTG's Losses ................................... 4

        2. The "Contamination" Exclusion Does Not Apply to OTG's Time Element "Loss" .......................................................................... 4

    B. COVID-19 Is A Covered "Risk of Direct Physical Loss or Damage" That Interrupted OTG's Businesses ................................................................. 5

        1. The COVID-19 Pandemic ......................................................................... 5

        2. COVID-19 Is a Covered Risk of Direct Physical Loss or Damage ........... 5

        3. OTG's Airport Businesses Sustained Actual and Threatened Direct Physical Loss or Damage ....................................................................... 6

        4. The Focus of Liberty's "Investigation" Confirms COVID-19 Is A Risk of Physical Loss or Damage under the Policy .................................. 7

III. LEGAL STANDARDS ........................................................................... 7

    A. Liberty Must Show That OTG Failed to State A Plausible Claim, Despite Construing All Allegations and Reasonable Inferences In OTG's Favor ............. 7

    B. Liberty's "All Risks" Policy Must Be Construed Broadly, Consistent With OTG's Reasonable Expectations, And Liberty Must Carry a "Heavy" Burden to Show Any Exclusion Applies ........................................................ 7

    C. Consistent New York and New Jersey Law Governs OTG's Contract Claims ............................................................................................ 8

IV. ARGUMENT ....................................................................................... 9

    A. OTG Plausibly Alleged that COVID-19 and Government Orders Triggered Several Distinct "Time Element," or Business Interruption, Coverages ........ 9

        1. Liberty Cannot Show that OTG Failed to Plead "Direct Physical Loss or Damage" Based On COVID-19 In the Air and On the Surfaces of Its Properties and Related Shutdown Orders ........................ 9

            a. "Loss *or* Damage" Creates Two Distinct Triggers of Coverage ..................................................................... 9

            b. OTG Plausibly Alleged Direct Physical "Damage," *i.e.*, Physical Alteration *or* Impairment of Property's Function or Value by an Unseen Physical Condition ................................. 11

            c. OTG Plausibly Alleged Direct Physical "Loss," *i.e.*, Inability to Utilize and Physical Dispossession of Property, from the Presence of COVID-19 and Government Orders .......... 13

i

# TABLE OF CONTENTS
(continued)

**Page**

         d.    Liberty Ignores Appellate Authority In Favor of Trial Court Opinions Misapplying *Roundabout Theatre*, Whose Unique Policy Language and Facts Have No Bearing on "Direct Physical Loss" or "Direct Physical Damage" Here ...................... 19

    2.    OTG Plausibly Pled That Government Orders Addressing COVID-19 Triggered Civil Authority Coverage .................................................... 22

    3.    OTG Plausibly Pled That "Physical Loss or Damage" from COVID-19 Triggered Contingent Time Element Coverage .................... 24

  B.    Liberty Failed to Carry Its "Heavy" Burden to Show the *Property Damage* Section's Contamination Exclusion Bars *Time Element* Loss and Expense ....... 25

    1.    By Its Terms, the Contamination Exclusion Is Limited to "Cost" in the *Property Damage* Section and Is Inapplicable to "Loss" and "Expense" Covered "Elsewhere" in the *Time Element* Section .............. 25

    2.    The Contamination Exclusion Cannot Apply Because It Is Ambiguous ................................................................................................... 26

    3.    The Contamination Exclusion's Lack of "Anti-Concurrent Causation" Language Creates Fact Questions that Are Not Ripe ........... 27

    4.    Liberty's Representations to Regulators Show that Either the Contamination Exclusion Does Not Apply in this Situation or Liberty Is Estopped from Relying On It .................................................. 28

  C.    Liberty's Miscellaneous Footnoted Arguments Are Unavailing and Waived ......................................................................................................... 29

V.    CONCLUSION ................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*242-44 East 77th Street, LLC v. Greater New York Mut. Ins. Co.*,
    31 A.D.3d 100 (1st Dep't 2006) ..................................................................8, 24, 25

*AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*,
    187 F. Supp. 3d 428 (S.D.N.Y. 2016)..........................................................................7

*Album Realty Corp. v. Am. Home Assur. Co.*,
    80 N.Y.2d 1008 (1992) ..............................................................................................27

*Arlandson v. Hartz Mountain Corp.*,
    792 F. Supp. 2d 691 (D.N.J. 2011) ...........................................................................30

*Atlas Assur. Co. v. Newark Ctr. Building Co.*,
    1998 WL 160933 (N.Y. Sup. Ct. Jan. 15, 1998)........................................................15

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................7, 12

*Blue Springs Dental Care, LLC v. Owners Ins. Co.*,
    488 F. Supp. 3d 867 (W.D. Mo. 2020) ..........................................................19, 23, 24

*Cantrell v. Farm Bureau Town & Country Ins. Co.*,
    876 S.W.2d 660 (Mo. Ct. App. 1994)........................................................................26

*Casino Beach Pier LLC v. Westchester Surplus Lines Ins. Co.*,
    2021 WL 1311047 (D.N.J. Apr. 8, 2021) ..................................................................11

*Cinemark Holdings, Inc. v. Factory Mut. Ins. Co.*,
    --- F. Supp. 3d ----, 2021 WL 1851030 (E.D. Tex. May 5, 2021) ...........................12

*Cypress Point Condo. Ass'n v. Adria Towers, L.L.C.*,
    143 A.3d 273 (N.J. 2016)...........................................................................................13

*Derek Scott Williams PPLC v. Cincinnati Ins. Co.*,
    2021 WL 767617 (N.D. Ill. Feb. 28, 2021) ..............................................................18

*Dewey v. Volkswagen AG*,
    558 F. Supp. 2d 505 (D.N.J. 2008) ...........................................................................16

*Elegant Massage, LLC v. State Farm Mut. Ins. Co.*,
    --- F. Supp. 3d ----, 2020 WL 7249624 (E.D. Va. Dec. 9, 2020) ......................14, 18

*Farmers Ins. Co. of Oregon v. Trutanich*,
   858 P.2d 1332 (Or. Ct. App. 1993)......................................................................15

*Fountain Powerboat Indus., Inc. v. Reliance Ins. Co.*,
   119 F. Supp. 2d 552 (E.D.N.C. 2000)..................................................................20

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009)...................................................................................7

*Gregory Packaging, Inc. v. Travelers Prop. Cas. Co.*,
   2014 WL 6675934 (D.N.J. Nov. 25, 2014) ................................................. *passim*

*Hedges v. United States*,
   404 F.3d 744 (3d Cir. 2005)....................................................................................7

*Henderson Rd. Rest. Sys., Inc. v. Zurich Am. Ins. Co.*,
   --- F. Supp. 3d ----, 2021 WL 168422 (N.D. Ohio Jan. 19, 2021).........10, 17, 18, 29

*Hill and Stout PLLC v. Mut. of Enumclaw Ins. Co.*,
   2020 WL 6784271 (Wash. Super. Ct. Nov. 13, 2020)...........................................19

*Indep. Barbershop LLC v. Twin City Fire Ins. Co.*,
   2020 WL 6572428 (W.D. Tex. Nov. 4, 2020)........................................................28

*JGB Vegas Retail Lessee, LLC v. Starr Surplus Lines Ins. Co.*,
   2020 WL 7190023 (Nev. Dist. Ct. Nov. 30, 2020)....................................19, 23, 27

*Johansing Family Enters. LLC v. Cincinnati Spec. Underwriters Ins.*,
   2021 WL 145416 (Ohio Com. Pl. Jan. 08, 2021) ..................................................19

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*,
   119 F.3d 1070 (3d Cir. 1997)................................................................................29

*Kingray, Inc. v. Farmers Grp., Inc.*,
   2021 WL 837622 (C.D. Cal. Mar. 4, 2021).............................................10, 13, 18

*Manpower Inc. v. Ins. Co. of the State of Pa.*,
   2009 WL 3738099 (E.D. Wis. Nov. 3, 2009) ........................................................14

*Matzner v. Seaco Ins. Co.*,
   1998 WL 566658 (Mass. Super. Ct. Aug. 12, 1998) .............................................16

*McKinley Dev. Leasing Co. v. Westfield Ins. Co.*,
   2021 WL 506266 (Ohio Com. Pl. Feb. 9, 2021)..............................................14, 19

*Michael J. Redenburg, Esq. PC v. Midvale Indem. Co.*,
   2021 WL 276655 (S.D.N.Y. Jan. 27, 2021) ..........................................................28

*Mid-Am. Salt, LLC v. Morris Cty. Coop. Pricing Council*,
  964 F.3d 218 (3d Cir. 2020)..................................................................................7

*In re Montgomery Ward & Co.*,
  428 F.3d 154 (3d Cir. 2005)................................................................................10

*Morton Int'l, Inc. v. Gen. Acc. Ins. Co. of Am.*,
  629 A.2d 831 (N.J. 1993).....................................................................................29

*Motorists Mut. Ins. Co. v. Hardinger*,
  131 Fed. App'x. 823 (3d Cir. 2005)..............................................................2, 15

*Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co.*,
  17 F. Supp. 3d 323, 325-26 (S.D.N.Y. Apr. 24, 2014).......................................21

*North State Deli, LLC v. Cincinnati Ins. Co.*,
  2020 WL 6281507 (N.C. Super. Ct. Oct. 9, 2020) .............................................13

*Optical Serv. USA/JCI v. Franklin Mut. Ins. Co.*,
  2020 N.J. Super. Unpub. LEXIS 1782 (N.J. Super. Ct. L. Div. Aug. 13, 2020)....................18

*P.F. Chang's China Bistro, Inc. v. Certain Underwriters at Lloyd's of London*,
  2021 WL 818659 (Cal. Super. Ct. Feb. 04, 2021) ..............................................19

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*,
  505 F.2d 989 (2d Cir. 1974)................................................................................27

*Parko Props., LLC v. Mercey Ins. Co.*,
  2020 WL 6799137 (N.J. App. Div. Nov. 19, 2020) ...................................8, 10, 14

*Pepsico, Inc. v Winterthur Int'l Am. Ins. Co.*,
  13 A.D.3d 599 (2d Dep't 2004) .................................................................3, 25, 27

*Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*,
  24 A.D.3d 743 (2d Dep't 2005) ....................................................................passim

*Port Authority of N.Y. & N.J. v. Affiliated FM Ins. Co.*,
  311 F.3d 226 (3d Cir. 2002)........................................................................passim

*Roundabout Theatre Co. v. Continental Cas. Co.*,
  302 A.D.2d 1 (1st Dep't 2002) ...............................................................2, 19, 20, 21

*Serendipitous, LLC v. Cincinnati Ins. Co.*,
  2021 WL 1816960 (N.D. Ala. May 6, 2021).........................................10, 17, 18, 22

*Sloan v. Phoenix of Hartford Ins. Co.*,
  207 N.W.2d 434 (Mich. Ct. App. 1973) ..............................................................20

*In re Society Ins. Co. COVID-19 Bus. Interruption Protection Ins. Litig.*,
   2021 WL 679109 (N.D. Ill. Feb. 22, 2021) ...................................................17, 18

*Sosa v. Mass. Bay Ins. Co.*,
   206 A.3d 1011 (N.J. App. Div. 2019)..................................................8, 10, 14, 24

*Southern Dental Birmingham LLC v. Cincinnati Ins. Co.*,
   2021 WL 1217327 (N.D. Ala. Mar. 19, 2021) ................................................19, 23

*Studio 417, Inc. v. Cincinnati Ins. Co.*,
   478 F. Supp. 3d 794 (W.D. Mo. Aug. 12, 2020) ........................................... *passim*

*Susan Spath Hegedus, Inc. v. ACE Fire Underwriters Ins. Co.*,
   No. 20-2832, Doc. 30 (E.D. Pa. May 7, 2021) ...............................................19, 26

*Tantillo v. CitiFinancial Retail Servs., Inc.*,
   2013 WL 622147 (D.N.J. Feb. 19, 2013) .............................................................8

*Taps & Bourbon on Terrace, LLC v. Underwriters at Lloyds London*,
   2020 WL 6380449 (Pa. Com. Pl. Oct. 26, 2020)...................................................19

*Thor Equities, LLC v. Factory Mutual Ins. Co.*,
   2021 WL 1226983 (S.D.N.Y. Mar. 31, 2021) ...........................................3, 26, 29

*Threadgill v. Armstrong World Industries, Inc.*,
   928 F.2d 1366 (3d Cir. 1991).............................................................................21

*Throgs Neck Bagels, Inc. v. GA Ins. Co. of N.Y.*,
   241 A.D.2d 66 (1st Dep't 1998) ...................................................................25, 26

*Tozzi v. Long Island R.R. Co.*,
   170 Misc. 2d 606 (N.Y. Sup. Ct. 1996) ..............................................................29

*TRAVCO Ins. Co. v. Ward*,
   715 F. Supp. 2d 699 (E.D. Va. 2010), *aff'd*, 504 Fed. App'x. 251 (4th Cir.
   2013) ..............................................................................................................15

*Urogynecology Specialist of Fla. LLC v. Sentinel Ins. Co.*,
   2020 WL 5939172 (M.D. Fla. Sept. 24, 2020) .....................................................27

*In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*,
   2020 WL 8970347 (D.N.J. Mar. 12, 2020)...........................................................12

*Victory Peach Grp., Inc. v. Greater N.Y. Mut. Ins. Co.*,
   707 A.2d 1383 (N.J. App. Div. 1998).....................................................................8

*Matter of Viking Pump, Inc.*,
   27 N.Y.3d 244 (2016) ...........................................................................8, 10, 11

*Visconti Bus Serv., LLC v. Utica Nat'l Ins. Grp.*,
  2021 WL 609851 (N.Y. Sup. Ct. Feb. 12, 2021) ..............................................22, 23

*Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*,
  968 A.2d 724 (N.J. App. Div. 2009) .............................................................. *passim*

*Western Fire Ins. Co. v. First Presbyterian Church*,
  437 P.2d 52 (Colo. 1968) ..........................................................................................16

**Other Authorities**

*Conjunctive/Disjunctive Canon*, Black's Law Dictionary (11th ed. 2019) ...................................10

*Repair*, Black's Law Dictionary (11th ed. 2019) ..........................................................................17

## I.      PRELIMINARY STATEMENT

Plaintiffs ("OTG") operate restaurants, bars, and other concessions in international airports, the arteries through which the COVID-19 pandemic spread around the world. OTG paid substantial premiums for an all-risk insurance policy to protect its business from such unexpected events affecting its property and resulting in business interruption. OTG brought this insurance coverage action to recover its business interruption losses resulting from the deadly presence of COVID-19 at its airport businesses and resulting government orders that deprived OTG of its business property until deemed safe for use. OTG alleged based on studies, data, and experience that (1) COVID-19 attached to and physically altered its property, (2) the physical presence of COVID-19 on surfaces and in the air at OTG's airport properties impaired their value and normal function, and (3) the presence of COVID-19 and resulting government orders physically dispossessed OTG's property by rendering it unusable. These well-pleaded allegations must be accepted as true. Courts that have appropriately accepted similarly detailed allegations have denied motions to dismiss COVID-19 business interruption insurance claims.

While COVID-19 is novel, Wausau's ("Liberty")[1] policy language is not. For decades, courts adhering to foundational insurance policy interpretation principles have held that policies like Liberty's insuring against "all risks" of "direct physical loss *or* damage" cover business interruption losses arising from not *only* structural alteration of property (Liberty's too-narrow test), but also conditions that impair or deprive utilization of covered property—such as deadly gases, asbestos fibers, or bacteria, among others.[2] Specifically, binding precedent that Liberty

---

[1] Defendant, a subsidiary of Liberty Mutual Holding Company, is referred to herein as "Liberty." Liberty's brief in support of its motion to dismiss is referred to as "Motion" and cited as "Mot."

[2] *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co.*, 2014 WL 6675934, at *4-7 (D.N.J. Nov. 25, 2014) (ammonia gas); *Port Authority of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226,

ignores construes "***physical damage***" to apply when property is physically altered *or* when an invisible "physical event" has "impaired" the normal "function" or "value" of covered property. *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 24 A.D.3d 743, 744 (2d Dep't 2005); *accord Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*, 968 A.2d 724, 734-37 (N.J. App. Div. 2009).[3] OTG alleged such "physical damage." Moreover, "***physical loss***" applies when a dangerous condition renders the insured's property temporarily "unusable." *Port Authority*, 311 F.3d at 235-36 (New York and New Jersey law); *accord Gregory Packaging*, 2014 WL 6675934, at *4-7 (New Jersey law). OTG *also* alleged "physical loss" from COVID-19 and the shutdown orders it caused. Thus, OTG pled plausible claims under both the "loss" and "damage" triggers of coverage.

Liberty's Motion, however, runs OTG's claims through a house of mirrors that distorts basic interpretive rules, liberal pleading standards, and COVID-19 itself. Rather than fulfilling OTG's "reasonable expectations" by giving all words in the Policy meaning and accepting coverage "to the full extent that any fair interpretation will allow," *Wakefern*, 968 A.2d at 733-34, Liberty reads "physical loss ***or*** damage" to mean only "damage"—and only *structural* damage at that. This subjects the Policy "to technical encumbrances or to hidden pitfalls" that Liberty's drafting did not elucidate, *id.*, and that Liberty's string of untested trial court opinions do not justify.[4] Further, Liberty disregards OTG's well-pleaded allegations supporting *both* "physical loss" *and* "physical damage" by branding them "conclusory," rather than accepting them as true

---

235-36 (3d Cir. 2002) (asbestos); *Motorists Mut. Ins. Co. v. Hardinger*, 131 Fed. App'x. 823, 824-27 (3d Cir. 2005) (E. coli bacteria).

[3] Absent any conflict of law, both New York and New Jersey law govern OTG's contract claims.

[4] Beyond considering allegations distinct from OTG's, Liberty's cases derive their legal analysis from a New York intermediate appellate case that is factually and legally inapposite. *See Roundabout Theatre Co. v. Continental Cas. Co.*, 302 A.D.2d 1 (1st Dep't 2002). The *Roundabout* insured sought coverage *solely* for physical "loss," and its unique policy explicitly equated "loss" with "*damage*" or "*destruction*" of the insured's own property, which suffered no harm at all. Liberty's Policy and OTG's allegations bear no resemblance.

2

and viewing them in OTG's favor. Confirming its loose approach, Liberty would also find no "physical loss or damage" based on its speculation untethered to the pleadings: that "cleaning and disinfecting" makes COVID-19 harmless. That contradicts OTG's allegations and the world's grave experience that COVID-19 persists by rapidly reinfecting surfaces and spreading through the air and person-to-person in closed spaces like OTG's bars and restaurants.

Liberty's final mirror trick would deny coverage based on a "contamination" exclusion that is limited to "cost[s]" for pollution-related claims under the Policy's "Property Damage" section—despite that OTG claims "loss" from a pandemic disease (COVID-19) and government orders covered under the "Time Element" (business interruption) section. *Cf. Thor Equities, LLC v. Factory Mutual Ins. Co.*, 2021 WL 1226983, at *3-4 (S.D.N.Y. Mar. 31, 2021) (denying motion to dismiss COVID-19 claim based on ambiguous contamination exclusion). This argument disregards Liberty's "heavy" burden to show the exclusion's application is "clear and unmistakable," with any doubt favoring OTG. *Pepsico, Inc. v Winterthur Int'l Am. Ins. Co.*, 13 A.D.3d 599, 600 (2d Dep't 2004). Liberty is also estopped from applying the exclusion based on its inconsistent statements to regulators about the exclusion's effect. Regardless, any application of the exclusion's causation language would create factual issues not ripe on a motion to dismiss.

## II.    WELL-PLEADED FACTS

### A.    The Policy Covers "All Risks of Direct Physical Loss or Damage"

Liberty is the sole drafter of the Policy, which insures OTG "against ***all risks of direct physical loss or damage***" except as excluded. Compl., ¶¶27-28, 71; *id.*, Ex. A at 8, 14 (emphasis added). The Policy's coverage applies to the "covered locations" in the Airports identified in the complaint. Compl., ¶¶4-18, 73; *id.*, Ex. A at 75, 78.

### 1.      The Time Element Sections Cover OTG's Losses

The Policy's "Time Element"—or "business interruption"—section applies to "loss," and "reasonable and necessary expenses to reduce the loss otherwise payable under" its coverages. Compl., ¶72; *id.*, Ex. A at 45. Time Element coverage pays for "actual loss sustained," "directly resulting from a loss of the type insured by this Policy" to property at a covered Airport location. Compl., Ex. A at 45. The Policy's definition of a "covered loss" is circular: it means a "loss to covered property caused by direct physical loss or damage insured by [the] Policy." *Id.* at 75. The Policy does not further define "direct" "physical" "loss" or "damage."

The Time Element Coverages are further "extended" to include, *inter alia*, the Attraction Property, Civil or Military Authority, Contingent Time Element, and Ingress / Egress coverages that have been triggered in connection with COVID-19 and related shutdown orders. Compl. ¶¶75-77, 82-95, *id.*, Ex. A at 52-56, 11. Each of these coverages applies to "loss sustained" and "extra expense" resulting from risks of "physical loss or damage." Compl., Ex. A at 52-55, 111.

### 2.      The "Contamination" Exclusion Does Not Apply to OTG's Time Element "Loss"

The Policy's "Section II–Property Damage" contains an exclusion for:

> **a.**      Contamination, and any ***cost*** due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, ***except as provided elsewhere in this Policy***.

*Id.* at 31 (emphases added). The Policy defines "contamination" as any "condition of property that results from a contaminant." *Id.* at 75. This exclusion is thus limited to barring coverage for "contamination" and certain "cost[s] due to contamination" under the "Section II–Property Damage" coverages. It ***does not apply*** to any purported "contamination" loss or expense covered "elsewhere in [the] Policy," such as the "Section III–Time Element" coverages. *Id.* at 31; Compl., ¶¶99-103. That is clear from that section's structure and language, which states that it is "subject

4

to the Policy provisions including **applicable** exclusions"—not **all** exclusions elsewhere in the Policy. Compl., Ex. A at 45 (emphasis added). And, the Time Element coverages described above each apply to "loss" and "expense"—using different language than the "cost" referenced in the Property Damage section's Contamination Exclusion and coverages.

### B.   COVID-19 Is A Covered "Risk of Direct Physical Loss or Damage" That Interrupted OTG's Businesses

#### 1.   The COVID-19 Pandemic

COVID-19 is a novel, highly contagious respiratory disease that has killed millions and infected tens of millions more, according to the World Health Organization (WHO) and Centers for Disease Control and Prevention (CDC). Compl., ¶¶31-32, 37-39. As a pandemic affecting a wide geographic area, COVID-19 has become "ubiquitous." *Id.*, ¶¶34-36, 67. It spreads (i) "from person to person," (ii) "through respiratory droplets," (iii) "through airborne transmission," and (iv) "by contact with objects or surfaces." *Id.*, ¶41. Studies show that COVID-19 can remain on surfaces for up to 28 days. *Id.*, ¶45. Airborne droplets and particles of COVID-19 "can linger in the air for minutes to hours." *Id.*, ¶42. A CDC study showed that a COVID-19 outbreak occurred because "air-conditioned ventilation" in a restaurant prompted droplet transmission. *Id.*, ¶43.

#### 2.   COVID-19 Is a Covered Risk of Direct Physical Loss or Damage

COVID-19 is a covered risk of direct physical loss or damage in multiple respects, as alleged in the complaint. First, COVID-19 caused "direct physical damage" because it "causes a physical, tangible alteration to property," *id.*, ¶40, and "impairs, damages, or alters [its] value, usefulness, or normal function," *id.*, ¶¶41, 53. Surfaces to which COVID-19 attaches are "fomites" capable of carrying and transmitting disease. *Id.*, ¶47. Not only can a person's contact with a fomite spread COVID-19, *id.*, ¶¶49-51, "disturbance" of a fomite (*e.g.*, "shaking" a tablecloth at an OTG restaurant) can also cause the virus to spread and attach to other surfaces or persons. *Id.*, ¶49.

COVID-19 has rendered the air at OTG's properties "noxious" and dangerous. *Id.*, ¶¶41-43, 55. These physical conditions in the air and surfaces of OTG's properties rendered them "nonfunctional for [their] normal occupancy or use." *Id.*, ¶53. Second, COVID-19 caused "direct physical loss" by causing the physical dispossession, inaccessibility, or lost utilization of covered property. The presence of COVID-19 on the surfaces and in the air at OTG's businesses rendered them "unsafe," "unusable," and "uninhabitable." *Id.*, ¶¶54-55. Such actual and threatened presence of COVID-19 at OTG's businesses, the Airports, and elsewhere, led to various government orders prohibiting in-person activities and operations at businesses including OTG's. *Id.*, ¶¶4, 75-77.

### 3. OTG's Airport Businesses Sustained Actual and Threatened Direct Physical Loss or Damage

The foregoing allegations support the complaint's specific allegations that COVID-19 was present, threatened, and caused physical loss or damage at OTG's covered business locations and the Airports in which they operate. *See id.*, ¶¶45-46, 56-69, 75-77. For additional support, the complaint alleges that hundreds of OTG employees with suspected or confirmed infections were present at the Airports and, based on CDC data, OTG employees likely were infected with COVID-19 at higher rates than already known. *Id.*, ¶58. OTG further alleges that over 11 million people with COVID-19 infections traveled through the Airports in which OTG's businesses were located from February 2020 through September 2020, many of whom were asymptomatic spreaders. *Id.*, ¶¶59-66. Other data released by the Transportation Security Agency (TSA) indicates that infections at Airports were widespread ***despite*** that TSA "increased the frequency and intensity of cleaning and disinfecting" checkpoint surfaces, among other steps to slow COVID-19. *Id.*, ¶65; *id.*, Ex. N at 4, 6-27. Thus, rapidly spreading COVID-19 was a "ubiquitous" source of actual and threatened physical loss and damage at OTG's Airport businesses. *See, e.g.*, *id.*, ¶¶48-50, 67-69.

### 4. The Focus of Liberty's "Investigation" Confirms COVID-19 Is A Risk of Physical Loss or Damage under the Policy

Liberty sought information regarding whether OTG's losses were connected to "exposure to someone with COVID-19" and "government order[s]." *Id.*, ¶¶106-110, 113. Yet Liberty later pivoted to deny coverage contending COVID-19 is not a "risk of physical loss or damage," despite declining to "reserve rights" on that basis, thereby waiving it. *Id.*, ¶¶111-22. Liberty's deceptive claim practices and wrongful refusal to provide coverage constitute a breach of contract, bad faith, and a violation of the New Jersey Consumer Fraud Act (NJCFA). *Id.*, ¶¶123-50.

## III. LEGAL STANDARDS

### A. Liberty Must Show That OTG Failed to State A Plausible Claim, Despite Construing All Allegations and Reasonable Inferences In OTG's Favor

"A motion to dismiss pursuant to Federal Rule 12(b)(6) should be granted only if, accepting as true the facts alleged and all reasonable inferences that can be drawn therefrom there is no reasonable reading upon which the plaintiff may be entitled to relief." *Mid-Am. Salt, LLC v. Morris Cty. Coop. Pricing Council*, 964 F.3d 218, 226 (3d Cir. 2020). Liberty "bears the burden of showing that no plausible claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). A "plausible" claim does *not* impose "heightened fact pleading of specifics." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). OTG need not "establish" a *prima facie* case, "but instead, need only put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]'" of coverage, viewing "the complaint in the light most favorable" to OTG. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210, 213 (3d Cir. 2009).

### B. Liberty's "All Risks" Policy Must Be Construed Broadly, Consistent With OTG's Reasonable Expectations, And Liberty Must Carry a "Heavy" Burden to Show Any Exclusion Applies

OTG's initial burden to show a covered loss under the "broad coverage" afforded by "all risks" insurance is "relatively light," *AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 187 F.

Supp. 3d 428, 438 (S.D.N.Y. 2016), because it covers all risks of direct physical loss or damage "except those specifically excluded," *242-44 East 77th Street, LLC v. Greater New York Mut. Ins. Co.*, 31 A.D.3d 100, 105 (1st Dep't 2006). To ascertain coverage, the Policy's "coverage provisions are to be read broadly, exclusions are to be read narrowly, potential ambiguities must be resolved in favor of the insured, and the policy is to be read in a manner that fulfills the insured's reasonable expectations." *Sosa v. Mass. Bay Ins. Co.*, 206 A.3d 1011, 1016 (N.J. App. Div. 2019); *see also Matter of Viking Pump, Inc.*, 27 N.Y.3d 244, 257 (2016). A provision is free of ambiguity only "if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *Viking Pump*, 27 N.Y.3d at 258; *see also Parko Props., LLC v. Mercey Ins. Co.*, 2020 WL 6799137, at *4-5 (N.J. App. Div. Nov. 19, 2020). Also, it is **Liberty's burden** to show that covered loss falls "within an exclusion or limitation." *Victory Peach Grp., Inc. v. Greater N.Y. Mut. Ins. Co.*, 707 A.2d 1383, 1387 (N.J. App. Div. 1998).

### C.    Consistent New York and New Jersey Law Governs OTG's Contract Claims

Liberty argues in a footnote that New York law governs the Policy, but because there is "no substantive difference" in the interpretive rules of New York and New Jersey, the Court may apply both states' laws. *Port Authority*, 311 F.3d at 233 (applying consistent New York and New Jersey law with respect to "all risks" policy based on substances in buildings in each state); *Tantillo v. CitiFinancial Retail Servs., Inc.*, 2013 WL 622147, at *7 (D.N.J. Feb. 19, 2013) (consistent laws allow resolution "without making a choice of law determination" despite choice of law clause).

IV.     **ARGUMENT**

   A.     **OTG Plausibly Alleged that COVID-19 and Government Orders Triggered Several Distinct "Time Element," or Business Interruption, Coverages**

Liberty's argument begins from a flawed premise: that the Policy's "direct physical loss *or* damage" language requires OTG to show that its losses *exclusively* relate to physical "*alteration*" of its covered properties, which it purportedly cannot do. Liberty insists that OTG's coverage claims must be dismissed because (1) the Policy only insures against a "risk of physical alteration," Mot. at 25; (2) OTG's allegations that COVID-19 was present at its Airport businesses and caused physical loss or damage are merely "conclusory," *id.* at 24-25, and (3) the forced closure of OTG's businesses is not itself physical loss or damage, *id.* at 17.

But this makes no sense. Liberty ignores that the "direct physical loss *or* damage" coverage clause plainly states two different coverage criteria. Equally, Liberty ignores that OTG's factual allegations—supported by recent studies and data—meet *both* criteria: OTG alleges that the presence of COVID-19 directly physically "damaged" OTG's properties *and* that COVID-19 and attendant shutdown orders caused direct physical "loss" (deprivation) of its properties.

On the whole, Liberty avoids the particulars of *this* case in order to lump it in with other decisions that dismissed COVID-19 business interruption claims on distinguishable grounds, misapplied case law, or both. But the Policy's language, liberal pleading standards, and a spate of well-reasoned cases bar Liberty from stifling OTG's well-pleaded allegations.

   1.     **Liberty Cannot Show that OTG Failed to Plead "Direct Physical Loss or Damage" Based On COVID-19 In the Air and On the Surfaces of Its Properties and Related Shutdown Orders**

   a.     **"Loss *or* Damage" Creates Two Distinct Triggers of Coverage**

The Policy's Time Element coverages apply to business interruption loss resulting from "direct physical loss *or* damage." This coverage clause must be construed "broadly," consistent

with "the insured's reasonable expectations." *Sosa*, 206 A.3d at 1016. It, and the Policy, must be interpreted "in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect." *Viking Pump*, 27 N.Y.3d at 257.

Accordingly, the word "or" in "direct physical loss or damage" is there for a reason. "Or" is "disjunctive," meaning it signifies alternatives. *See In re Montgomery Ward & Co.*, 428 F.3d 154, 166 (3d Cir. 2005); *see also Conjunctive/Disjunctive Canon*, Black's Law Dictionary (11th ed. 2019) ("[I]n a legal instrument … *or* joins a disjunctive list to create alternatives."). Thus, direct physical "loss" *or* "damage" triggers coverage, and each has independent meaning.

Liberty, however, collapses two phrases into one by construing "direct physical loss *or* damage" to always require "physical alteration" of covered property. Mot. at 25. This creates "surplusage," which "cannot be countenanced." *Viking Pump*, 27 N.Y.3d at 261. Over and again, courts have rejected this argument by giving "every word" of physical "loss," "damage," and the disjunctive "or" distinct meaning. *See, e.g.*, *Kingray, Inc. v. Farmers Grp., Inc.*, 2021 WL 837622, at *8 (C.D. Cal. Mar. 4, 2021) (New York and California law); *Serendipitous, LLC v. Cincinnati Ins. Co.*, 2021 WL 1816960, at *4 (N.D. Ala. May 6, 2021); *Henderson Rd. Rest. Sys., Inc. v. Zurich Am. Ins. Co.*, --- F. Supp. 3d ----, 2021 WL 168422, at *10 (N.D. Ohio Jan. 19, 2021).

As importantly, even assuming Liberty can reply with an arguably "plausible" construction, it cannot show, as it must, that OTG's interpretation is unreasonable to the average insured. *See Parko Props.*, 2020 WL 6799137, at *4-5; *Viking Pump*, 27 N.Y.3d at 257-58. For example, it would be unavailing to suggest that direct physical "loss" refers only to misplacement or theft of property. The Policy *includes* that meaning, but why would it *exclude* other plausible meanings of physical "loss" absent language saying so? Liberty's Policy crystallizes the point by elsewhere referring to "loss or damage" to "[OTG's] *real property*," which cannot be misplaced

10

or carried away. Compl., Ex. A at 124 (N.Y. Changes Endorsement at F.). The "covered locations" include OTG's real property at each Airport. *Id.* at 78 (listing addresses). This confirms that the ordinary meaning of direct physical "loss *or* damage"—which must accord throughout the Policy—covers more than Liberty lets on. *Cf. Viking Pump*, 27 N.Y.3d at 261 (rejecting insurer's coverage interpretation because "it would be inconsistent with the language of" a policy condition). In any event, OTG plausibly alleges both direct physical "loss" *and* "damage."

      **b.**      **OTG Plausibly Alleged Direct Physical "Damage," *i.e.*, Physical Alteration *or* Impairment of Property's Function or Value by an Unseen Physical Condition**

The meaning of direct physical "damage" is a fitting starting point because Liberty at least attempts to supply an answer ("physical alteration"), as unduly cabined as it is. In reality, New York's and New Jersey's appellate courts interpret the undefined phrase direct "physical damage" to reasonably include not only physical alteration, but ***also*** "impair[ment]" of property's "function" or "value" by a "physical event"—even if such damage is not structural or visible to the naked eye. *Pepsico*, 24 A.D.3d at 744 (holding "faulty ingredients" physically damaged insured's product despite no "demonstrable alteration of [the] physical structure" of the products); *accord Wakefern*, 968 A.2d at 734-37 (relying on *Pepsico* to hold "physical damage" in Liberty policy includes non-structural "loss of function or value" of grocery store); *see also Casino Beach Pier LLC v. Westchester Surplus Lines Ins. Co.*, 2021 WL 1311047, at *6 (D.N.J. Apr. 8, 2021) (recognizing in COVID-19 business interruption action that *Wakefern*, *Gregory Packaging*, and *Port Authority*, discussed *infra*, demonstrate how "direct physical loss or damage" has been interpreted in "both the New Jersey state courts and the Third Circuit" to include "unusable" property).

This *independently* requires denial of Liberty's Motion because OTG plausibly alleged "direct physical damage" to its properties based on *both* such "loss of function or value" *and* physical "alteration" of its business property from COVID-19's dangerous mix into the air and

11

attachment to the surfaces of OTG's properties. *See, e.g.*, *Cinemark Holdings, Inc. v. Factory Mut. Ins. Co.*, --- F. Supp. 3d ----, 2021 WL 1851030, at *3 (E.D. Tex. May 5, 2021) (holding complaint satisfied "physical alteration" standard by alleging that "COVID-19 was actually present and actually damaged the property by changing the content of the air."). OTG alleged that COVID-19 caused "a physical, tangible alteration to [its] property" and also "impairs, damages, or alters [its property's] value, usefulness, or normal function." Compl., ¶¶40-41, 53. OTG backed its allegations with a number of government or scientific studies and data which support (1) the rapid proliferation and ubiquitous presence of COVID-19 at the Airports and OTG's businesses, *supra* Section II.B.3; (2) COVID-19's ability to survive and spread between persons, in air that becomes "noxious," and on "fomites," *supra* Section II.B.2; and (3) COVID-19's deadly threat to those it may infect on OTG's properties, such as employees and customers, *supra* Section II.B.1—which, to put it mildly, hinders the "function" or "value" of OTG's service-oriented business properties.

Especially viewed in OTG's favor, its allegations plausibly allege "physical damage" on their face. Reliance on such studies and data only further "belies [Liberty's] characterization of these allegations as mere conclusions." *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2020 WL 8970347, at *12 (D.N.J. Mar. 12, 2020) (denying motions to dismiss complaints based on "FDA reports"); *see also Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 802 (W.D. Mo. Aug. 12, 2020) ("Regardless of the allegations in … other cases, Plaintiffs here have plausibly alleged that COVID-19 particles attached to and damaged their property, which made their premises unsafe and unusable. This is enough to survive a motion to dismiss."). Liberty's assertion that OTG's plausible allegations of physical damage are "conclusory" is pure surmise that assumes a "heightened fact pleading" standard inapplicable here. *Twombly*, 550 U.S. at 555.

12

> **c.**     **OTG Plausibly Alleged Direct Physical "Loss,"** *i.e.*, **Inability to Utilize and Physical Dispossession of Property, from the Presence of COVID-19 and Government Orders**

Though Liberty attempts to apply the same "physical alteration" interpretation to direct "physical ***loss***," that phrase must have distinct meaning from the foregoing "physical damage." Because the Policy fails to define "physical loss," dictionary definitions appropriately shed light on its "plain and commonly understood meaning." *Cypress Point Condo. Ass'n v. Adria Towers, L.L.C.*, 143 A.3d 273, 286 (N.J. 2016). One court's review of dictionary definitions confirms that the ordinary meaning of "loss" is pliant even when modified by "direct" and "physical":

> Merriam-Webster defines "direct," when used as an adjective, as "characterized by close logical, causal, or consequential relationship," as "stemming immediately from a source," or as "proceeding from one point to another in time or space without deviation or interruption." *Direct*, <u>Merriam-Webster</u> (Online ed. 2020).… The definition [of 'physical'] from Black's Law Dictionary comports: "Of, relating to, or involving material things; pertaining to real, tangible objects." *Physical*, <u>Black's Law Dictionary</u> (11th ed. 2019). Finally, "loss" is defined as "the act of losing possession," "the harm of privation resulting from loss or separation," or the "failure to gain, win, obtain, or utilize." *Loss*, <u>Merriam-Webster</u> (Online ed. 2020).…
>
> Applying these definitions reveals that **the ordinary meaning of the phrase "direct physical loss" includes the inability to utilize or possess something** in the real, material, or bodily world, resulting from a given cause without the intervention of other conditions.

*North State Deli, LLC v. Cincinnati Ins. Co.*, 2020 WL 6281507, at *3 (N.C. Super. Ct. Oct. 9, 2020) (bolding added); *accord Studio 417*, 478 F. Supp. 3d at 800 ("loss" means "deprivation.").

These common usages ratify insureds' reasonable expectations of coverage for "physical loss" based on, *e.g.*, "***physical dispossession*** because of dangerous conditions." *Kingray*, 2021 WL 837622, at *7-8 (emphasis added) (applying consistent New York and California interpretive principles to deny motion to dismiss COVID-19 business interruption claim). And, even had

Liberty intended a different meaning of "direct physical loss," its failure to use "better drafting [to] put the issue beyond debate" nullifies its narrower construction. *Sosa*, 206 A.3d at 1016; *see also Manpower Inc. v. Ins. Co. of the State of Pa.*, 2009 WL 3738099, at \*5, 7 (E.D. Wis. Nov. 3, 2009) (giving "loss" and "damage" different meanings to avoid surplusage, and finding modifiers "direct" and "physical" display, at best, "imprecise" drafting).

Indeed, ample case law confirms that physical dispossession or inability to utilize is within "the spectrum of accepted interpretations" of "direct physical loss"—and so it must apply in the insured's favor. *Elegant Massage, LLC v. State Farm Mut. Ins. Co.*, --- F. Supp. 3d ----, 2020 WL 7249624, at \*9-10 (E.D. Va. Dec. 9, 2020) (collecting cases and denying motion to dismiss COVID-19 business interruption claim); *see also McKinley Dev. Leasing Co. v. Westfield Ins. Co.*, 2021 WL 506266, at \*3 (Ohio Com. Pl. Feb. 9, 2021) (that courts found spectrum of meanings of "physical loss or damage" confirms ambiguity); *Parko Props.*, 2020 WL 6799137, at \*4-5 (rejecting insurer's "plausible" interpretation of other terms because cases and common definitions confirmed reasonable "alternative interpretation" favoring insured).

Especially apt here, in *Port Authority* the Third Circuit applied consistent New York and New Jersey interpretive principles to hold that "direct physical loss" occurs when dangerous conditions render the insured's property "unusable." *Port Authority*, 311 F.3d at 235-36. Port Authority sought coverage under an "all risks" policy to pay for removal of asbestos from its properties. *Id.* at 230. Observing that "the policies cover ***'physical loss,' as well as damage***," the court affirmed that lost utilization or habitation of a covered property is a "physical loss" when caused by dangerous conditions such as "large quantities of asbestos ***in the air*** of a building." *Id.* at 236 (emphases added). Port Authority's own claim fell short only because the amount of asbestos fibers in the air at its properties did not "exceed[] EPA standards" and the properties had

"continued in normal use." *Id.* at 231. Given the *absence* of an immediate threat of dangerous aerial particles, Port Authority experienced no "loss of utility" of its buildings and thus could not recover for "physical loss"—but under different facts, others could. *Id.* at 236; *see also Atlas Assur. Co. v. Newark Ctr. Building Co.*, 1998 WL 160933, at *4, 7-8 (N.Y. Sup. Ct. Jan. 15, 1998) (holding "all risk" coverage applied when previously safe spray-on asbestos became friable and "permeate[d]" building after exposure to water leakage, rendering building unsafe for use).

Applying that analysis, in *Gregory Packaging* this court held that the unexpected dispersal of ammonia gas into the air at the insured's business location caused "direct physical loss or damage" by "physically render[ing] the facility ***unusable for a period of time*.*" See Gregory Packaging*, 2014 WL 6675934, at *4-7 (emphasis added). Unlike in *Port Authority*, the ammonia dispersal exceeded "a safe level for occupancy" and caused government authorities to clear the premises and temporarily halt entry "until the ammonia was dissipated." *Id.* at *3-4. The court held that the dispersal caused "direct physical loss or damage" because it "physically transformed the air within [the insured's] facility so that it contained an unsafe amount of ammonia," and temporarily "rendered the facility unfit for occupancy." *Id.* at 6. As in *Pepsico*, *Wakefern*, and *Port Authority*, *supra*, it was immaterial that the conditions caused no "structural alteration" because they still physically deprived the insured's property of "its essential functionality." *Id.* at *5-6.

These are but a few of the many cases holding, before the COVID-19 pandemic, that all risks of "direct physical loss" include physical dispossession or inability to utilize the insured's property due to a dangerous or disruptive condition on it.[5] Indeed, insurers have been on notice for

---

[5] *See, e.g.*, *Hardinger*, 131 Fed. App'x. at 824-27 (holding e. coli bacteria in water supply caused "physical loss" by rendering home "useless or uninhabitable"); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 709 (E.D. Va. 2010), *aff'd*, 504 Fed. App'x. 251 (4th Cir. 2013) (holding toxic gases released by defective drywall caused "physical loss" by rendering home uninhabitable); *Farmers Ins. Co. of Oregon v. Trutanich*, 858 P.2d 1332, 1336 (Or. Ct. App. 1993) (holding odor from

*over fifty years* that the undefined words "direct physical loss or damage" reasonably cover more than "some tangible injury to the physical structure" of property. *See Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 56 (Colo. 1968) (holding gasoline fumes rendering church building unusable caused physical loss). Given Liberty elected not to alter its language in light of these authorities, they validate insureds' reasonable expectations that all risks of "direct physical loss" include allegations that covered property was physically dispossessed or its utility was deprived by COVID-19 and related government orders.

And OTG plausibly alleged that the invisible but harmful presence of COVID-19 on the surfaces and in the air at its businesses rendered those spaces "unsafe," "unusable," and "uninhabitable," like the foregoing "physical loss" cases. *See* Section II.B.2. That is especially so because OTG's businesses operate in confined, air conditioned spaces. *See, e.g.*, Compl. ¶¶41-43; *id.*, Ex. D (CDC study of "outbreak" at restaurant). To the extent that Liberty disputes such allegations and studies, those are "issues of fact not appropriate for resolution at the motion to dismiss stage." *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 524 n.17 (D.N.J. 2008).

Moreover, based on such conditions, government orders "prohibit[ed] or limit[ed]" in-person activities and operations at OTG's properties and similar businesses in numerous jurisdictions. Compl., ¶¶4, 75-77. In order to "minimize[] the spread of COVID-19," these orders caused a "deprivation of [OTG's] property and loss of use of such property." *Id.*, ¶77. Thus, the orders are *also* a covered "risk of physical loss." *Id.*, ¶¶67, 77.

These grounds for "physical loss" plainly are not "exogenous to the premises themselves." *Cf.* Mot. at 17, 21. Even independent of the government orders, OTG has been dispossessed of

---

methamphetamine lab caused physical loss); *Matzner v. Seaco Ins. Co.*, 1998 WL 566658, at *3-4 (Mass. Super. Ct. Aug. 12, 1998) (holding carbon monoxide caused physical loss).

property or its utilization to stop and prevent further COVID-19 on its premises. Liberty even admits that the orders also caused or contributed to "loss of use," *id.* at 21, which arises from the same dangerous condition—the widespread COVID-19 pandemic—directly impairing OTG's property, *see, e.g.*, *Serendipitous*, 2021 WL 1816960, at *5 (COVID-19 orders covered). Much as the governmental action to clear the ammonia-filled premises in *Gregory Packaging* contributed to "physical loss," so too did the government orders here. 2014 WL 6675934, at *3-4.

Nor is the express coverage grant for "physical loss" overridden by the Policy's "Period of Liability" language. *Cf.* Mot. at 21-22. Liberty argues that the provision's reference to property being "repaired or replaced" "inherently requires some change in the physical condition of the property." *Id.* As OTG has alleged such a physical alteration to its property, Liberty's argument fails. Liberty's construction is also wrong. The provision only sets the time period during which elsewhere-covered business interruption loss continues until OTG "could have been physically capable of resuming the level of 'operations' which existed prior to the loss or damage." *Henderson*, 2021 WL 168422, at *13 (finding shutdown orders covered).

And "nothing inherent in the meanings of ['repair' or 'replace'] would be inconsistent" with coverage here. *See In re Society Ins. Co. COVID-19 Bus. Interruption Protection Ins. Litig.*, 2021 WL 679109, at *9 (N.D. Ill. Feb. 22, 2021). "Repair" or "replace" could easily refer to potential mitigative actions ranging from attempting to modify the business space to better combat COVID-19 (*e.g.*, erecting physical barriers), to substituting the affected physical space or noxious air (*e.g*, changing ventilation or finding alternative workspace). *See id.*; *see also* Compl., Ex. F at 3 (CDC cautioned that mitigation against airborne transmission may call for "special engineering controls"). Nothing in the Policy circumscribes these generic terms, as Liberty would do. *Cf. Repair*, Black's Law Dictionary (11th ed. 2019) (definitions 1-4: to "restore to a sound or good

17

condition," "renew, revive," "remedy, heal, or make right again," "make amends for (an injury or injustice, etc.)," or "indemnify someone for … a loss."); *Derek Scott Williams PPLC v. Cincinnati Ins. Co.*, 2021 WL 767617, at *4 (N.D. Ill. Feb. 28, 2021) (finding "repair" is not "inherently physical" based on similar usage); *Serendipitous*, 2021 WL 1816960, at *5 n.3 (same).

Accordingly, numerous courts have denied motions to dismiss well-pleaded claims for "direct physical loss" from COVID-19 under substantively identical language, including:

- *Kingray*, 2021 WL 837622, at *7 (holding under New York law that "it is plausible that 'direct physical loss of' property includes physical dispossession because of dangerous conditions" or "a civil authority order requiring [the insured] to close," rendering it "unusable for its only purpose—the operation of a business");

- *Elegant Massage*, 2020 WL 7249624, at *10 (holding "direct physical loss" applies when covered property is "deemed uninhabitable, inaccessible, and dangerous to use by [government] Orders because of its high risk for spreading COVID-19," because those facts are similar to cases finding "direct physical loss" because "asbestos, ammonia, odor from methamphetamine lab, or toxic gases from drywall … caused properties [to be] uninhabitable, inaccessible, and dangerous to use");

- *In re Society Ins. Co.*, 2021 WL 679109, at *8-9 & n.4 (denying motions to dismiss COVID-19 business interruption claims because "a reasonable jury can find that the [insured restaurants] did suffer a direct 'physical' loss of property" given the insureds "in fact pleaded that their losses were caused by" the pandemic and the shutdown orders, which "impose a *physical* limit" by depriving restaurants "from using much of their physical space," and call for insureds to "expand," "repair," or "replace" their "physical space");

- *Studio 417*, 478 F. Supp. 3d at 801-02 (finding similarly well-pleaded "physical loss" to restaurants and salons based on allegations that the presence of COVID-19 and attendant government orders shuttered their "unsafe and unusable" properties, citing *Port Authority*);

- *Henderson*, 2021 WL 168422, at *11-13 (holding orders requiring "restaurants' closings" caused "physical loss"); *accord Serendipitous*, 2021 WL 1816960, at *4-6;

- *Derek Scott Williams PLLC*, 2021 WL 767617, at *2-4 (denying motion to dismiss business interruption claim because COVID-19 and government orders allegedly prevented "normal business operations" for weeks, causing "a deprivation of the use" of physical property).

Consistent interpretive principles and pleading standards compel the same result here.[6]

---

[6] Many other courts have issued similar opinions or summarily ordered that such allegations are to be challenged based on proof, not pleadings. *See, e.g.*, *Optical Serv. USA/JCI v. Franklin Mut. Ins.*

> **d.    Liberty Ignores Appellate Authority In Favor of Trial Court Opinions Misapplying *Roundabout Theatre*, Whose Unique Policy Language and Facts Have No Bearing on "Direct Physical Loss" or "Direct Physical Damage" Here**

Liberty's Motion assumes OTG has not alleged direct physical loss or damage by fully omitting the interpretation set forth in *Pepsico* and *Wakefern*—valid state appellate authorities that must be considered. *See Gregory Packaging*, 2014 WL 6675934, at *5 n.2. Liberty instead heavily relies on a string of trial court opinions—soon to face appellate scrutiny—purportedly applying *Roundabout Theatre Co. v. Continental Cas. Co.*, 302 A.D.2d 1 (1st Dep't 2002). That reliance is misplaced because *Roundabout* and other pre-COVID-19 authority Liberty cites focused on whether the words "physical ***loss***" cover the "loss of use of premises alone," absent a physical condition at the insured's property. Mot. at 18. That is a different issue than the meaning of "physical ***damage***," as in *Pepsico* and *Wakefern*. Moreover, *Roundabout's* construction of "***loss***" is *also* inapplicable here because of the starkly different policy language and facts in that case.

In *Roundabout*, the court found no coverage for "loss of use" of the insured's theatre due to a street closure forced by physical damage to "off-site property"—*not* the insured's own property. *See* 302 A.D.2d at 3-5. The policy (unlike Liberty's) covered "***loss of, damage to, or***

---

*Co.,* 2020 N.J. Super. Unpub. LEXIS 1782, at *26 (N.J. Super. Ct. L. Div. Aug. 13, 2020) (relying on *Wakefern*, *supra*, to deny motion to dismiss); *Susan Spath Hegedus, Inc. v. ACE Fire Underwriters Ins. Co.*, No. 20-2832, Doc. 30 at 17 (E.D. Pa. May 7, 2021); *Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 488 F. Supp. 3d 867, 879 (W.D. Mo. 2020); *Southern Dental Birmingham LLC v. Cincinnati Ins. Co.*, 2021 WL 1217327, at *7 (N.D. Ala. Mar. 19, 2021); *Taps & Bourbon on Terrace, LLC v. Underwriters at Lloyds London*, 2020 WL 6380449, at *1 n.1 (Pa. Com. Pl. Oct. 26, 2020); *McKinley Dev.*, 2021 WL 506266, at *6; *P.F. Chang's China Bistro, Inc. v. Certain Underwriters at Lloyd's of London*, 2021 WL 818659, at *1 (Cal. Super. Ct. Feb. 04, 2021); *Johansing Family Enters. LLC v. Cincinnati Spec. Underwriters Ins.*, 2021 WL 145416, at *1 (Ohio Com. Pl. Jan. 08, 2021); *JGB Vegas Retail Lessee, LLC v. Starr Surplus Lines Ins. Co.*, 2020 WL 7190023, at *4 (Nev. Dist. Ct. Nov. 30, 2020); *Hill and Stout PLLC v. Mut. of Enumclaw Ins. Co.*, 2020 WL 6784271, at *3 (Wash. Super. Ct. Nov. 13, 2020).

*destruction of* property or facilities" caused by "all risks of direct physical loss or damage ***to the [insured's] property***." *Id.* at 7 (emphases added). It also contained a unique provision that assumed that when a covered loss occurred, the insured would find a "Substitute Theatre" comparable to "the [covered] theatre ***which has been damaged or destroyed***." *Id.* at 8 (emphasis added). Thus the policy's peculiar language equated "loss" with partial damage or total destruction of the insured's property—resembling nothing in Liberty's Policy.

Confirming this distinction, *Roundabout* observed that other cases finding "loss of use" coverage were distinguishable because "they involved policies which offered more expansive coverage than the policy in this case." *Id.* at 8. In one, the court found "civil authority" coverage because it did ***not*** expressly require "damage to or destruction of" property. *Id.* at 8 (discussing *Sloan v. Phoenix of Hartford Ins. Co.*, 207 N.W.2d 434, 435-36 (Mich. Ct. App. 1973)). In another, the court found "ingress/egress" coverage based on off-property issues because that section did not require the insured's own property to be harmed. *Id.* (discussing *Fountain Powerboat Indus., Inc. v. Reliance Ins. Co.*, 119 F. Supp. 2d 552, 556 (E.D.N.C. 2000)). *Fountain* explicitly reasoned that a ***"'loss' is not predicated on physical damage*** but is one category of recovery along with damage and destruction ***as indicated by the use of the alternative coordinating conjunction 'or.'"*** 119 F. Supp. 2d at 557 (emphases added). This reasoning made sense in *Fountain*—as here— because the policy lacked distinct terms like in *Roundabout* narrowing covered "loss" to mean *only* partial "damage" or total "destruction." *Cf.* 302 A.D.2d at 8.

Consequently, *Roundabout* stands for the limited proposition that a policy equating "loss" of "the [insured's] property" with damage to or destruction of that property naturally does not cover "loss of use" resulting from damage to "***off-site property***." *Id.* at 7-8. *Roundabout* does not instruct that direct "physical ***loss***" under Liberty's readily distinguishable policy language requires

20

a showing of damage to or destruction of OTG's property. Nor, of course, does it override the New York and New Jersey appellate courts' subsequent interpretations in *Pepsico* and *Wakefern* that direct "physical ***damage***" includes nonstructural "impair[ment]" of property's "function" or "value." *Pepsico*, 24 A.D.3d at 744; *Wakefern*, 968 A.2d at 734-37.

Liberty's heavy reliance on *Newman* is more of the same—and actually lends support to OTG. There, a business sought coverage for lost access to its office because its power company preventatively shut off service ahead of a hurricane. *See Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co.*, 17 F. Supp. 3d 323, 325-26 (S.D.N.Y. Apr. 24, 2014). The court found there cannot be "physical loss or damage" absent any physical condition affecting the premises, relying on *Roundabout*. *Id.* at 329-30. Crucially, in doing so the court agreed that "'***physical loss or damage***' *need not* "*be tangible, structural or even visible,*" but distinguished "cases involving odors, noxious fumes," and other invisible physical conditions—including cases OTG cites above—because "[t]hose characteristics are not presented" by the purely preventative power loss. *Id.* at 331 (emphasis added). Thus, *Newman* supports a finding of covered physical loss or damage presented by an invisible, dangerous physical condition—like COVID-19.

In this proper light, Liberty's string of trial court opinions erroneously applying *Roundabout* and *Newman* to dismiss COVID-19 business interruption claims resembles a scarecrow: dressed up, with no meat inside. *See* Mot. at 18-20. Those cases insupportably construe "physical loss" to require tangible physical alteration, based on precedents that hold no such thing. What's more, ***every case but one*** fails to consider the "physical damage" analysis of the Appellate Division in *Pepsico*, 24 A.D.3d 743, despite applying "New York law."[7] The lone exception did

---

[7] Because neither federal nor state trial court opinions are binding as "New York law," the court can and should disregard all of these misguided or factually distinguishable decisions. *See Threadgill v. Armstrong World Industries, Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991).

not question *Pepsico's* validity but found it inapplicable because the insured "maintained … that **its premises have not been infected**" with COVID-19. *See Visconti Bus Serv., LLC v. Utica Nat'l Ins. Grp.*, 2021 WL 609851, at *3, 5 n.2 (N.Y. Sup. Ct. Feb. 12, 2021) (emphasis in original). Any such case that does not involve robust allegations supporting physical loss *and* damage based on the actual presence of COVID-19 and government orders bears no resemblance to OTG's plausible claims and does not deter application of *Pepsico* here.

Finally, Liberty glibly reasons that claims must be dismissed based on its conjecture that widespread COVID-19 is easily "eliminated with 'routine cleaning and disinfecting.'" Mot. at 23. It is a wonder, then, that the pandemic persists. In truth and as alleged, COVID-19 is pervasive because it rapidly spreads, damages property, and kills via people, surfaces, and the air, especially in closed environments like restaurants. If OTG could have saved business with bleach, it would have. But disinfecting some particles on surfaces is "only one precaution" that does not stop rampant reinfection, *see Serendipitous*, 2021 WL 1816960, at *5-6, much less arguably more dangerous aerial particles. That is why by early 2021 TSA still employed hundreds of people at the Airports where OTG operates with "active COVID-19 infections" despite "increas[ing] the frequency and intensity of cleaning and disinfecting" checkpoint surfaces. Compl., ¶65; *id.*, Ex. N at 4, 6-27. Liberty's wishful thinking does not override these allegations, nor the grave reality.

### 2. OTG Plausibly Pled That Government Orders Addressing COVID-19 Triggered Civil Authority Coverage

The "Civil or Military Authority" coverage part applies if a government order "prohibits access" to an OTG location due to actual or imminently threatened "physical loss or damage" at or within one mile of OTG's property. Compl., Ex. A at 18, 111. OTG alleged that the COVID-19 pandemic caused both the threat of and *actual* loss and damage at its own properties *and* in the surrounding Airports. *See, e.g.*, Compl. ¶¶64-69, 85-86. It also alleged that government orders

"prohibited" access to OTG's and other Airport businesses in order to "prevent and limit the spread of COVID-19" on such properties. *Id.*, ¶¶77, 87-90. Those orders resulted in the "deprivation of Plaintiffs' property and loss of use of such property." *Id.*, ¶77. Taken as true and construed in OTG's favor, these allegations state a plausible claim for Civil Authority coverage. *See, e.g.*, *Studio 417*, 478 F. Supp. 3d at 803-04 (denying motion to dismiss civil authority claims based on COVID-19 shutdown orders); *Blue Springs Dental*, 488 F. Supp. 3d at 877-79 (same); *Southern Dental*, 2021 WL 1217327, at *7 (same); *JGB Vegas Retail*, 2020 WL 7190023, at *3 (same).

Apart from incorrectly questioning whether COVID-19 *ever* causes or threatens "physical loss or damage," Liberty's only response is that OTG failed to allege that the government orders prohibited *all* "access to the premises" because many people "traveled through airports" while orders were in effect. Mot. at 27-28. Not so. Liberty strains to make this connection by conflating the "airports" with "airports **and** Plaintiffs' locations." *Id.* at 28 (emphasis added). Just because persons were permitted elsewhere in the "airports" does not mean they were allowed to be present in each distinct business premises within the airports. Rather, as detailed above, OTG alleges that its premises were at times "unusable" or "uninhabitable" and access was "prohibited" by orders. Compl., ¶¶55, 77. Further, absent any allegation that persons were allowed onto each OTG property under each order, it is at least reasonable to infer that at least some orders *completely* prohibited access, satisfying even Liberty's errant heightened standard.[8]

Further, the Civil or Military Authority coverage provision does not actually suggest that "prohibited" means to prevent "*any* access." Interpreting it to do so would flip the script on courts'

---

[8] Liberty's cases concluding that Civil Authority coverage did not apply did so based on their finding that COVID-19 was not a risk of "direct physical loss or damage." For the reasons discussed above, those cases are inapposite. They also involve sparser allegations. *See, e.g.*, *Visconti*, 2021 WL 609851, at *12 (insured did not plead it was subject to order).

instruction to construe *coverage provisions* "broadly" and *exclusions* "narrowly," consistent with the "insured's reasonable expectations." *Sosa*, 206 A.3d at 1016; *see also 242-44 East 77th Street LLC*, 31 A.D.3d at 105-06. For example, in *Studio 417* the court denied a motion to dismiss a Civil Authority coverage claims where the relevant government order stated "that all inside seating is prohibited in restaurants." 478 F. Supp. 3d at 803-04. The government order used the same plain language as Liberty's Policy to "prohibit access" to insured locations for *customers* to protect public health, even as it permitted restaurants to continue to cook food for takeout or delivery service. *Id.* During an ongoing public health emergency, an insured would reasonably expect this form of government coercion to be covered absent stricter language in the policy prohibiting "all access" or "any access." *See Blue Springs Dental*, 488 F. Supp. 3d at 879. The coverage provision's language does not bear the weight of Liberty's interpretation.

### 3. OTG Plausibly Pled That "Physical Loss or Damage" from COVID-19 Triggered Contingent Time Element Coverage

Liberty contests as "threadbare" OTG's allegations supporting "Contingent Time Element" coverage, which is triggered by "physical loss or damage" experienced by OTG's direct or indirect "customer, supplier, contract manufacturer or contract service provider." Compl., Ex. A at 53; *cf.* Mot. at 29-31. But OTG alleged that other persons and businesses were also subject to COVID-19 exposure or resulting orders to stop or slow the pandemic. *See, e.g.*, Compl., ¶¶64-69, 77, 91-92. This plausibly subjected to physical loss or damage the direct and indirect suppliers and providers that OTG's concession businesses rely upon to serve customers.

This coverage also plausibly applies because COVID-19 and government orders physically restricted OTG's "customers" from using its businesses. "Customers" who passed through the Airports, for example, carried or were exposed to COVID-19 on their persons and possessions, causing physical loss or damage. *Id.*, ¶¶40-56, 64-69. This proliferated the threat of COVID-19,

contributing to shutdowns and diminished travel. Premising coverage on such physical loss or damage restricting "customers" from physically attending OTG's businesses is a sensible interpretation of the Policy that an airport concession business would reasonably expect.

**B.      Liberty Failed to Carry Its "Heavy" Burden to Show the *Property Damage* Section's Contamination Exclusion Bars *Time Element* Loss and Expense**

Liberty's other principal basis for denying *all* coverage is the "contamination" exclusion contained within the Policy's "Section II–Property Damage." This argument fails because the Contamination Exclusion does not apply to "losses" under the "Section III–Time Element" coverage. Even assuming *arguendo* that it could, courts recognize that its language creates factual questions regarding causation that cannot be resolved on a motion to dismiss, the exclusion is ambiguous, and Liberty is estopped from relying on it here in any event.

**1.      By Its Terms, the Contamination Exclusion Is Limited to "Cost" in the *Property Damage* Section and Is Inapplicable to "Loss" and "Expense" Covered "Elsewhere" in the *Time Element* Section**

It is Liberty's "heavy" burden to show that an exclusion or exception to coverage applies. *Pepsico*, 13 A.D.3d at 600 (holding contamination exclusion inapplicable). Exclusions are also "given a strict and narrow construction, with any ambiguity resolved against the insurer." *242-44 East 77th Street, LLC*, 31 A.D.3d at 105. "To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Throgs Neck Bagels, Inc. v. GA Ins. Co. of N.Y.*, 241 A.D.2d 66, 71 (1st Dep't 1998).

Liberty cannot carry its burden, first, because the Policy's language and structure show that the Contamination Exclusion does not apply to the Time Element coverages. The Contamination Exclusion is within the *Property Damage* section and expressly states that it applies to "[c]ontamination, and any ***cost*** due to contamination … ***except as provided <u>elsewhere</u> in this***

25

*Policy*." Compl., Ex. A at 31 (emphases added). "Elsewhere," the Time Element section states that it is only subject to "applicable exclusions," *id.* at 45—not *all* exclusions in the Policy. *Cf. Susan Spath*, Doc. No. 30 at 22 (finding whether virus exclusion may apply "ambiguous" given the "structure of the Policy"). Absent a "clear and unmistakable" instruction in the Policy, it would be unreasonable to read the Property Damage section's Contamination Exclusion to negate swaths of express coverage in the Time Element section that "would reasonably be expected to apply" here and in other cases. *See Throgs Neck Bagels*, 241 A.D.2d at 71; *see also Cantrell v. Farm Bureau Town & Country Ins. Co.*, 876 S.W.2d 660, 664-65 (Mo. Ct. App. 1994) (finding it unreasonable to interpret a contamination exclusion to bar a loss covered elsewhere in policy).

That the Contamination Exclusion applies only to "cost" also weds it to the Property Damage section alone. In contrast, the *Time Element* coverages under which OTG seeks coverage use conspicuously different wording by covering "loss" and "extra expense." *See supra* Section II.A.1. This is obvious when comparing, *e.g.*, the similar "Protection and Preservation of Property" clauses in each section. They are materially the same except the *Property Damage* clause refers to covered "cost" while the *Time Element* clause refers to "loss." Compl., Ex. A at 41, 56. This shows Liberty's use of different language to demarcate two different coverages. Because a reasonable insured would expect that distinction to have meaning, especially as to an exclusion, the Contamination Exclusion potentially applies only to Property Damage "cost[s]"—not to OTG's Time Element "loss." *See Thor Equities*, 2021 WL 1226983, at *3-4 (finding contamination exclusion "ambiguous" and denying motion to dismiss because policy "distinguishes between 'cost' and 'loss' elsewhere, but no such distinction is present" in the exclusion).

        **2.**      **The Contamination Exclusion Cannot Apply Because It Is Ambiguous**

The Contamination Exclusion is also ambiguous, at best, because it describes pollution claims, not an outbreak of a pandemic disease. Liberty repeatedly refers to COVID-19 as a "virus"

subject to the Contamination Exclusion, but COVID-19 is a pandemic disease that is a step removed from the virus it is *caused by*, "SARS-CoV-2." And the Contamination Exclusion groups "virus" and other illness-causing agents with "pollutant," "hazardous material," "toxins," etc.— language that has long been recognized to apply to industrial or environmental pollution claims. *See Pepsico*, 13 A.D.3d at 600-01 (holding a "contamination" exclusion referring to "pollution" "is directed to environmental pollution" because New York courts favor "a commonsense approach" to exclusions in light of insureds' "reasonable expectations"). This indicates that the exclusion targets physical loss or damage directly caused by the release of a virus or other hazardous substance that is the subject of an industrial pollution claim. Accordingly, Liberty cannot show it is unreasonable to find that its narrowly construed exclusion is limited to pollution claims rather than reaching claims based on communicable disease (COVID-19) and related government orders for which the Policy otherwise grants coverage, as discussed above. *See, e.g.*, *Urogynecology Specialist of Fla. LLC v. Sentinel Ins. Co.*, 2020 WL 5939172, at *4 (M.D. Fla. Sept. 24, 2020) ("Denying coverage for losses stemming from COVID-19… does not logically align with the grouping of the virus exclusion with other pollutants" in a contamination exclusion); *JGB Vegas Retail*, 2020 WL 7190023, at *3 (contamination exclusion ambiguous).

### 3. The Contamination Exclusion's Lack of "Anti-Concurrent Causation" Language Creates Fact Questions that Are Not Ripe

By its terms, the Contamination Exclusion precludes coverage "due to" contamination. The efficient proximate cause test has long governed such "due to" or "caused by" language in all risks policies. *See Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1006 (2d Cir. 1974) (New York law); *Album Realty Corp. v. Am. Home Assur. Co.*, 80 N.Y.2d 1008, 1009-10 (1992) (finding exclusion for loss "caused by … freezing" inapplicable when burst sprinkler caused flooding, even though "property damage would not have occurred in the absence of

freezing."). To contract around that proximate causation requirement, insurers may employ "anti-concurrent causation" language barring coverage when, *e.g.*, a virus plays *any* causative role in the loss. "Anti-concurrent causation" language states, for example, that the insurer will not pay for "loss or damage caused ***directly or indirectly*** by … [a]ny virus … ***regardless of any other cause*** or event that contributes concurrently or in any sequence to the loss." *Michael J. Redenburg, Esq. PC v. Midvale Indem. Co*., 2021 WL 276655, at *7 (S.D.N.Y. Jan. 27, 2021) (emphases added).

Liberty chose to use this broader "anti-concurrent causation" language in ***other*** exclusions, but ***not*** in its narrower Contamination Exclusion. *Compare* Compl., Ex. A at 29 (Exclusion 2.a.), *with id.* at 31 (Exclusion 4.a.). As a result, Liberty must show that "virus" is the direct proximate cause of each "cost" for the Contamination Exclusion to apply, rather than the proximate cause being, *e.g.*, a shutdown order or the insured closing its business because "someone with [the COVID-19] ***disease <u>caused by</u> a virus*** came in"—again, COVID-19 is a pandemic disease that is a step removed from the virus that caused it. *Cf. Indep. Barbershop LLC v. Twin City Fire Ins. Co.*, 2020 WL 6572428, at *3 (W.D. Tex. Nov. 4, 2020) (emphases added) (stating court would consider such proximate cause issues had exclusion lacked anti-concurrent causation language). At minimum, Liberty cannot carry its burden on that fact issue on a motion to dismiss.

### 4.    Liberty's Representations to Regulators Show that Either the Contamination Exclusion Does Not Apply in this Situation or Liberty Is Estopped from Relying On It

The Contamination Exclusion is also inapplicable because Liberty represented to regulators that it is "not a reduction in coverage" for "losses involving contamination by disease-causing agents." Compl., ¶104. That conflicts with Liberty's position now that it bars coverage for supposed COVID-19 "contamination" claims that longstanding authorities show are within the Time Element section's coverage grants (*see supra*). Either Liberty's statements to regulators confirm that the exclusion is inapplicable to already-covered COVID-19-related losses, or they

28

were misrepresentations that estop Liberty from taking a contrary position now. *See Morton Int'l, Inc. v. Gen. Acc. Ins. Co. of Am.*, 629 A.2d 831, 874 (N.J. 1993) (applying regulatory estoppel regarding pollution exclusion); *see also Tozzi v. Long Island R.R. Co.*, 170 Misc. 2d 606, 613 (N.Y. Sup. Ct. 1996) (distinguishing *Morton's* facts but holding "a litigant may utilize the doctrine of estoppel" to bar enforcement of a contract term). Liberty only undermines its argument by acknowledging that estoppel potentially applies under New Jersey or New York law and that there is a "factual dispute" over its statements to regulators. *See* Mot. at 33-35.

### C. Liberty's Miscellaneous Footnoted Arguments Are Unavailing and Waived

Liberty raises some arguments only in footnotes, thereby waiving them. *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997). Regardless, they fail.

Liberty contends that a "loss of market or loss of use" exclusion in the Policy's *Property Damage* section bars coverage. Mot. at 37 n.11. But it does not apply to the *Time Element* coverages for similar reasons as the Contamination Exclusion. Moreover, it merely confirms that the Policy does not cover "loss of use" absent "physical loss or damage," which OTG plainly alleged. Read otherwise, its ambiguous wording could void the Policy's business interruption coverage, which cannot be. *See Henderson*, 2021 WL 168422, at *16 ("Loss of Use" exclusion inapplicable to business interruption coverage because it could be read to "bar coverage when there is physical damage caused by … a fire, that closes a restaurant while it is being repaired."); *see also Thor Equities*, 2021 WL 1226983, at *5 (denying motion to dismiss given "loss of market or loss of use" exclusion's uncertain scope and variety of factual possibilities supporting coverage).

Liberty also argues that OTG's claims under certain extended coverages fail due to the purported absence of "loss or damage." *See* Mot. at 25-26, 30 n.9, 39 n.15. The "Attraction Property" coverage applies because Airport terminals and businesses within them attract customers to OTG's bars and restaurants and plausibly experienced "loss or damage." The "Difference in

29

Conditions/Difference in Limits" coverage applies because OTG alleged physical "loss" and "damage" at the Canadian Airport business location, too. *See* Compl., ¶¶13, 66-69, 96-98. "Ingress / Egress" coverage applies because "loss or damage" prevented access to OTG's allegedly uninhabitable and inaccessible properties. *Id.*, ¶¶55, 77, 93-94. It makes no difference that people passed through other parts of the Airports while OTG's distinct properties within them were shut down. *See, e.g.*, *Studio 417*, 478 F. Supp. 3d at 803-04 (finding same coverage applies to suspended restaurants and salons). The "Protection and Preservation of Property" coverages also apply because it is unreasonable for Liberty to assume that OTG's concessions took no costly actions to adapt to COVID-19, shutdown orders, and resumption of "limited in-person dining." Compl., ¶77.

Finally, Liberty assumes that New York law applies to its extracontractual conduct. *See* Mot. at 38 n.14. Not so. Any conflict of law involving the NJCFA is subject to the Restatement's "most significant relationship" test. *See Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 708 (D.N.J. 2011). The claim is proper because Liberty's misrepresentations were relied upon in New Jersey by a New Jersey plaintiff and concern property and risks in the state. *See id.* at 709 ("New Jersey Plaintiffs may state an NJCFA claim"); *see also* Compl., ¶¶10, 19, 22, 142-49.

## V.  CONCLUSION

Liberty's motion lacks merit and should be denied.

May 11, 2021                                      Respectfully submitted,

                                                 */s/ Harvey Bartle IV*
Sergio F. Oehninger (*pro hac vice*)             Harvey Bartle IV
MORGAN, LEWIS & BOCKIUS LLP                      MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.                   502 Carnegie Center
Washington, D.C. 20004                           Princeton, New Jersey 08540
Tel: 202.739.3000                                Tel: 609.919.6600
Fax: 202.739.3001                                Fax: 609.919.6701
sergio.oehninger@morganlewis.com                 harvey.bartle@morganlewis.com

                                                 *Attorneys for Plaintiffs*