UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| OTG MANAGEMENT PHL LLC, *et al.*, <br><br> **Plaintiff,** <br><br> v. <br><br> EMPLOYERS INSURANCE COMPANY OF WAUSAU, <br><br> **Defendant.** | Civil Action No.: <br> 2:21-cv-01240-WJM-MF <br><br> **OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

This matter arises out of Defendant Employers Insurance Company of Wausau's ("Defendant") alleged breach of an insurance contract and denial of insurance coverage to Plaintiff OTG Management LLC and certain of its subsidiaries (collectively, "Plaintiffs") related to losses caused by the ongoing COVID-19 pandemic. Before the Court is Defendant's motion (the "Motion") to dismiss the Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6), ECF No. 14. For the reasons set forth below, Defendant's Motion is **GRANTED**.

## I.      BACKGROUND[1]

### A.      Plaintiff's Insurance Claim and COVID-19 Losses

Plaintiff OTG Management LLC is a Delaware limited liability company and ultimate parent of each of the other Plaintiffs in this action.[2] Together, Plaintiffs operate and manage a variety of airport concessions, including restaurants, bars, markets providing food and beverage services, and other airport retail concessions, in airports across the United States. Compl. ¶ 4. Defendant is an insurance company organized under the laws

---

[1] Unless otherwise indicated, all facts in this section are taken from the Complaint, ECF No. 1, and are assumed to be true for purposes of this Opinion.

[2] The other Plaintiffs are: (1) OTG Management PHL LLC; (2) OTG Management PHL B, LLC; (3) LaGuardia USA LLC; (4) LGA Airport Restaurants, L.P.; (5) OTG DCA Venture II LLC; (6) OTG JFK T2 Venture, LLC; (7) OTG JFK T5 Venture, LLC; (8) OTG Management T8 LLC; (9) OTG Management JFK LLC; (10) OTG Management EWR LLC; (11) OTG Management IAH, LLC; (12) OTG Management Midwest LLC; (13) OTG Management YYZ, LLC; (14) OTG MCO Venture II LLC; (15) OTG ORD Venture LLC; (16) OTG Experience, LLC; and (17) OTG Concepts Franchising, LLC.

of Wisconsin with its principal place of business in Massachusetts. *Id.* at ¶ 20. Defendant issued a commercial property insurance policy to Plaintiff OTG Management LLC as named insured (the "Policy") covering the period from June 1, 2019 through June 1, 2020. *Id.* at ¶¶ 24, 26; Compl., Ex. A. The Policy also provides coverage to each of the other Plaintiffs as subsidiaries of OTG Management LLC. *Id.* at ¶ 25; Compl., Ex. A., § I.A.

Unfortunately, Plaintiffs' business was among the many that sustained losses throughout 2020 as a result of the COVID-19 pandemic. Specifically, Plaintiffs allege that, because their retail operations are located inside of airports, they were particularly hard hit by the damage caused by COVID-19 itself as well as the preventative measures taken by governments and the public to limit non-essential travel and other activities. *See* Compl. ¶¶ 57-69, 76-77.

Plaintiffs submitted a business interruption claim for their losses due to the COVID-19 pandemic under the Policy to Defendant on March 16, 2020. *Id.* at ¶ 107. Shortly thereafter, Defendant responded to Plaintiffs' claim by asking several questions about the nature of Plaintiffs' losses, and, on April 15, 2020, issued a reservation of rights letter. *Id.* at ¶¶ 108-11. On June 26, 2020, Plaintiffs responded to Defendant's inquiries about the nature of their losses. *Id.* at ¶ 114. On September 16, 2020, Defendant denied coverage under the Policy, stating, among other things, that neither COVID-19 nor government orders related thereto was a risk of physical loss or damage and that Plaintiffs' claim fell under certain applicable coverage exclusions in the Policy.

    **B.**    **The Policy**

The Policy is an all-risk commercial property insurance policy that provides coverage against "all risks of direct physical loss or damage" to Plaintiffs' insured property except as otherwise limited or excluded therein. Compl., Ex. A., § I.C. The Policy is comprised of two types of insurance coverage: (1) "Property Damage"; and (2) "Time Element." *See generally id.* at §§ II-III. The former provides coverage for direct physical loss or damage to certain specified types of real or personal property, except for loss or damage caused by certain excludable events or circumstances. *Id.* at §§ II.A, C. Among these exclusions, and of particular importance here, are (a) "loss or damage from enforcement of any law or ordinance . . . [r]egulating the construction, repair, replacement, use or removal, including debris removal, of any property" (the "Law or Ordinance Exclusion"), *id.* at § I.C.1(f)(1); and "unless directly resulting from a covered loss,[3]" (b) "[c]ontamination, and any cost due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided elsewhere in th[e] Policy" (the "Contamination Exclusion"), *id.* at § I.C.4(a). The Policy defines "contamination" broadly as "[a]ny condition of property that results from a contaminant." *Id.* at § VII.4. In turn, the Policy further defines "contaminant" as "[a]ny foreign substance, impurity, pollutant, hazardous material, poison, toxin,

---

[3] The Policy defines a "covered loss" as "[a] loss to covered property caused by direct physical loss or damage insured by th[e] Policy." Compl., Ex. A, § VII.5.

2

pathogen or pathogenic organism, bacteria, *virus*, disease causing or illness causing agent, fungus, mold or mildew." *Id.* at § VII.(3) (emphasis added).

"Time Element" coverage, meanwhile, covers certain losses and expenses incurred as a result of a necessary interruption in business operations directly resulting from physical loss or damage to Plaintiffs' insured property. *Id.* at § III.A. In addition, the Policy extends such Time Element coverage to a variety of circumstances in which Plaintiffs' business operations may be interrupted even though Plaintiffs' insured property may not have suffered any direct physical loss or damage, including (1) physical loss or damage to a nearby "attraction property" Plaintiffs depend on to attract customers ("Attraction Property Coverage"), *id.* at § III.E.1; (2) orders of civil or military authorities caused by physical loss or damage to Plaintiffs' insured property or similar nearby property prohibiting access to Plaintiffs' insured property ("Civil Authority Coverage"), *id.* at § III.E.2; (3) physical loss or damage to locations of certain of Plaintiffs' direct or indirect customers, suppliers, contract manufacturers or contract service providers ("Contingent Time Element Coverage"), *id.* at § III.E.4; and (4) physical loss or damage to certain property which directly prevents ingress or egress to Plaintiffs' insured premises, ("Ingress/Egress Coverage"), *id.* at § III.E.8. In a section titled "Time Element Exclusions," the Policy identifies several specific exclusions to Time Element coverage, none of which are themselves applicable to the present dispute. Before going on to identify these specific losses excluded from Time Element coverage, however, the section's introductory clause provides that "[i]n addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss . . . ." *Id.* at § III.D.

### C. Procedural History

On January 27, 2021, Plaintiffs filed their four-count Complaint asserting claims arising out of Defendant's denial of their claim for business interruption insurance coverage. Broadly speaking, Plaintiffs allege that they suffered financial losses due to the necessary closure of their businesses in light of the physical loss or damage caused by the presence of COVID-19 on their premises and by various government shut-down orders issued to try and mitigate the spread thereof, and that Defendant wrongfully denied insurance coverage for such losses. The Complaint seeks both a declaration stating that Plaintiffs' losses are insured under the Policy as well as money damages for Defendant's alleged breach of the insurance contract. In addition, the Complaint sets forth claims for bad faith denial of insurance coverage and for violations of the New Jersey Consumer Fraud Act (the "NJCFA"), N.J.S.A. 56:8-2.

## II. LEGAL STANDARD

FRCP 12(b)(6) provides for the dismissal of a complaint if the plaintiff fails to state a claim upon which relief can be granted. The movant bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss under FRCP 12(b)(6), "all allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). The Court

3

need not accept as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a 12(b)(6) motion, the Court is ordinarily limited to the facts as alleged in the complaint, the exhibits attached thereto, and matters of public record. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1996 (3d Cir. 1993). The Court may, however, look outside the pleadings and also consider "document[s] integral to or explicitly relied upon in the complaint" or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Asbestos Prod. Liability Litig. (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016).

To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## III. DISCUSSION

Plaintiffs allege that Defendant's denial of coverage under the Policy for losses suffered as a result of the COVID-19 pandemic constituted a breach of the insurance contract, and that Defendant's denial of such coverage and its investigation with respect thereto were made in bad faith and violated the NJCFA. The Court disagrees and addresses each claim in turn.

### A. Counts I and II: Declaratory Judgment and Breach of Contract

#### 1. Choice of Law

At the outset, the Court must resolve an apparent dispute between the parties as to which state's law governs Plaintiffs' breach of contract claim. Defendant argues that the choice-of-law provision in Section I.H of the Policy's Declarations requires the application of New York law. *See* Mot. at 14 n.6; Compl., Ex. A., § I.H. Plaintiffs suggest that the Court can apply both New Jersey and New York law because there is no discernible substantive difference between the two with respect to breaches of insurance contracts.

Though Plaintiffs may be correct that there is no substantive difference between the laws of New York and New Jersey as it relates to the interpretation of insurance contracts, for the avoidance of doubt, the Court finds that New York law governs Plaintiffs' contract claim. In diversity cases, the Court applies the choice-of-law rules of New Jersey to determine the controlling substantive state law. *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017). "New Jersey gives effect to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 331 (3d Cir. 2001). Here, the Policy provides that "[t]he validity and interpretation of this Policy shall be governed by and construed in accordance

with the laws of the state of New York." Compl., Ex. A., § I.H. Neither party argues, and the Court does not find, that there is any public policy of New Jersey which would caution against the application of New York law to this dispute. Accordingly, the Court will enforce the terms of the Policy's choice-of-law provision and apply New York law to Plaintiffs' breach of contract claim.

### 2.     Interpretation of Insurance Contracts Generally

Under New York law, "insurance policies are interpreted according to general rules of contract interpretation." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 98 (2d Cir. 2012). The Court must "give effect to the intent of the parties as expressed in the clear language of the contract" read "in light of common speech and the reasonable expectations of a businessperson." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quotations omitted). In so doing, the insurance contract should be read as "a harmonious and integrated whole" and "construed in a manner which gives effect to each and every part, so as not to render any provision meaningless or without force or effect." *Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.*, 462 F. Supp. 3d 317, 322 (S.D.N.Y. 2020) (quotations omitted). Thus, "[w]here the provisions of a policy are clear and unambiguous, they must be given their plain and ordinary meaning, and [the Court] should refrain from rewriting the agreement." *Roundabout Theatre Co. v. Cont'l Cas. Co.*, 302 A.D.2d 1, 6 (N.Y. App. Div. 2002) (alteration omitted). If, however, the relevant provisions of the policy are ambiguous, the Court must resolve any such ambiguity against the insurer. *Dean v. Tower Ins. Co. of N.Y.*, 979 N.E.2d 1143, 1145 (N.Y. 2012). The provisions of an insurance contract are ambiguous where they are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usage and terminology as generally understood in the particular trade or business." *Olin Corp.*, 704 F.3d at 99.

As the party seeking coverage, the insured "bears the burden of showing that the insurance contract covers the loss." *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000). Once an insured satisfies its initial burden to establish that coverage for its claim exists, however, the burden shifts to the insurer to demonstrate that an exclusion to coverage under the insurance policy applies. *Michael J. Redenburg, Esq. PC v. Midvale Indemnity Co.*, – F.3d – , 2021 WL 276655, at *7 (S.D.N.Y. Jan. 27, 2021). An exclusion to coverage is read narrowly and will only serve to bar coverage of an insured's claim where it is "stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 126 A.D.3d 76, 83 (N.Y. App. Div. 2015).

### 3.     The Contamination Exclusion Excludes Coverage for Plaintiffs' Claim

Defendant argues that the Contamination Exclusion categorically bars any coverage under the Policy for losses sustained due to COVID-19. Plaintiffs, unsurprisingly, disagree, and argue that the Contamination Exclusion is inapplicable to losses and expenses for

5

which coverage is sought under the Time Element section of the Policy, is otherwise ambiguous in its application to pandemics as opposed to industrial pollution claims, is inapplicable to Plaintiffs' claim for coverage because the efficient proximate cause of their losses is the various government closure orders rather than COVID-19 itself, and that Defendant is estopped from claiming that the Contamination Exclusion applies. The Court agrees with Defendant that the Contamination Exclusion bars Plaintiffs' claim for coverage under the Policy.

### i. The Contamination Exclusion Applies to Plaintiffs' Claim

Plaintiffs argue that the Contamination Exclusion applies only to claims made under the Property Damage section of the Policy, rather than the Time Element section under which they seek coverage, and only for certain "costs" as opposed to "losses" and "extra expenses." The Court disagrees.

First, although set forth in the Property Damage section of the Policy, it is clear that the Contamination Exclusion applies to both the Property Damage and Time Element coverages provided for therein. The section of the Policy describing the exclusions applicable to Time Element coverage is unambiguous and makes clear that, in addition to the "Time Element"-specific exclusions set forth in that section, the "exclusions elsewhere in [the] Policy . . . apply to Time Element loss." Compl., Ex. A., § III.D. Carving out exclusions set forth in the Property Damage section – the only other section in which exclusions to coverage are listed – as Plaintiffs suggest would impermissibly render the phrase "exclusions elsewhere in [the] Policy" a null set, and therefore meaningless. To that end, Plaintiffs' argument that the Policy's acknowledgment that Time Element coverage is subject to "applicable exclusions," and that therefore there is some unknown set of exclusions which do not apply, is unpersuasive: *See* Compl., Ex. A, § III(B). The Policy makes clear that the exclusions set forth in the other coverage sections, i.e., Property Damage, are "applicable exclusions" with respect to Time Element coverage.

For this same reason, Plaintiffs' narrow reading of the Contamination Exclusion itself is untenable. Plaintiffs argue that because the Contamination Exclusion excludes coverage for contamination "except as provided elsewhere in th[e] Policy" it obviously cannot apply to losses that fall squarely under the specific Time Element coverages set forth in separate sections of the Policy. This reading of the Policy, however, is backwards: it requires to Court to find that the Contamination Exclusion is the rule, and the coverage types provided in the Policy the exceptions which necessarily swallow that rule. Taken to its logical conclusion, Plaintiffs' theory would effectively write out all coverage exclusions contrary to the intention of the parties and the clear language of the Policy. Rather, reading the Policy as a whole, it is clear that the phrase "except as provided elsewhere in th[e] Policy" as used in the Contamination Exclusion refers to specific forms of contamination which are expressly covered by the Policy. *See, e.g.*, Compl., Ex. A, §§ II.D.7-8 (providing certain coverage for debris removal and decontamination costs resulting from a covered loss); *id.* at § II.D.26 (providing coverage for certain radioactive contamination); *id.* at § IV.C.1(b) (covering certain losses caused by ammonia contamination).

Second, Plaintiffs' distinction between "*costs* of Contamination" excluded from coverage by the Contamination Exclusion and "losses" or "extra expenses" covered under the Time Element coverage is similarly unpersuasive. As noted, the Policy broadly defines the term "contamination" to mean "any condition of property that results from a contaminant" such as a virus. *Id.* at § VII(3)-(4). In other words, the Contamination Exclusion unambiguously provides that Defendant will not cover "any condition of property" resulting from a virus nor any cost due to any condition of property resulting from a virus. Moreover, the Contamination Exclusion clearly and unambiguously encompasses "the inability to use or occupy property." Thus, regardless of whether there is a distinction between "costs" on the one hand and "losses" and "extra expenses" on the other, it is clear that the Contamination Exclusion cannot be so limited without rendering parts of it entirely meaningless. *See Ralph Lauren Corp. v. Factory Mut. Ins. Co.*, No. 20-10167 (SDW) (LDW), 2021 WL 1904739, at *4 (D.N.J. May 12, 2021), *appeal filed*, May 26, 2021; *cf. Thor Equities, LLC v. Factory Mut. Ins. Co.*, – F.3d – . 2021 WL 1226983, at *4 (S.D.N.Y. Mar. 31, 2021) (denying insurer's motion to dismiss based on nearly identical contamination exclusion but acknowledging that limiting such exclusion's application to "costs of contamination" could "tend to render certain aspects of the exclusion meaningless").

### ii.     The Contamination Clause is Unambiguous

Plaintiffs argue that even if the Contamination Exclusion could theoretically apply to claims for Time Element loss under the Policy, it is nonetheless ambiguous, and therefore cannot be applied, with respect to their present claim for coverage. Specifically, Plaintiffs argue that the Contamination Exclusion refers only to viruses and various pollutants, not pandemic diseases caused by viruses, and that it was intended to apply only to the localized release or spread of a virus as part of an industrial pollution claim. Once again, the Court disagrees.

The distinction Plaintiffs appear to draw between a pandemic disease and the virus it is caused by is unavailing and has been overwhelmingly rejected by other courts that have considered the issue, including recent decisions of federal courts in New York applying New York law. *See, e.g.*, *Midvale*, 2021 WL 276655, at *8 n.5 ("[T]he COVID-19 pandemic is simply a large-scale outbreak of a virus."); *Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford*, No. 1:20-cv-4736-GHW, 2021 WL 2403088, at *9 (S.D.N.Y. June 11, 2021) ("[U]nder the plain meaning of 'any,' that definition encompasses all viruses regardless of whether the virus causes infections on a global scale or causes no infections at all."); *100 Orchard St., LLC v. Travelers Indemnity Ins. Co. of Am.*, No. 20-CV-8452 (JMF), 2021 WL 2333244, at *2 (S.D.N.Y. June 8, 2021) ("[I]n the context of a viral pandemic, the word 'pandemic' describes a disease's geographic prevalence; it does not replace disease as the harm-causing agent." (quotations omitted)). Perhaps more to the point, the distinction between the coronavirus disease ("COVID-19") and the virus it is caused by ("SARS-CoV-2") is incoherent in the context of the Contamination Exclusion, which applies to viruses and any "disease causing . . . agent." Plaintiffs fail to explain how the Contamination Exclusion would retain any meaning if it were limited to loss or damage

7

due to viruses or "disease causing agents" and became inapplicable whenever those viruses or disease-causing agents actually cause a disease. Such a distinction would effectively write the Contamination Exclusion out of the Policy.

Moreover, in defining the contaminants that could result in "contamination" within the meaning of the Contamination Exclusion, the Policy makes clear that the Exclusion applies to "[a]ny . . . virus" without any limitation as to whether that virus occurs in the context of a global pandemic or industrial pollution. *See Off. Sol. Grp.*, 2021 WL 2403088, at *9 (rejecting argument that "Microbe Exclusion," which applied to viruses, was limited only to wood and structural damage rather than pandemics because of references to "wet or dry rot" and "fungi"). Indeed, the case Plaintiffs primarily rely on in support of this argument, *Urogynecology Specialist of Fla. LLC v. Sentinel Ins. Co.*, 489 F. Supp. 3d 1297 (M.D. Fla. 2020), has been considered an outlier and not followed by the majority of courts interpreting similar exclusionary clauses. *See, e.g.*, *100 Orchard St.*, 2021 WL 2333244, at *3 (collecting cases).

The Court joins the overwhelming majority of courts that have considered Plaintiffs' argument with respect to the interpretation of similar insurance coverage exclusions in the context of the COVID-19 pandemic and concludes that the Contamination Exclusion is unambiguous and applies to insurance claims under the Policy for losses due to the COVID-19 pandemic.

### iii. COVID-19 Was the Efficient Proximate Cause of Plaintiffs' Losses

Plaintiffs further argue that the Contamination Exclusion does not apply to their losses because Defendant has not sufficiently demonstrated that the virus itself is the efficient proximate cause thereof rather than the government shutdown orders or the voluntary closure of Plaintiffs' business operations due to the presence of someone infected with COVID-19 on their premises. This argument, however, is unavailing.

Under New York law, "where a covered and excluded peril combine to cause a covered loss, courts typically apply the efficient proximate cause rule – meaning, that the insured is entitled to coverage only if the covered peril is the predominant cause of the loss or damage." *Parks Real Estate*, 472 F.3d at 48 (quotations omitted). "The efficient proximate cause of a loss is the cause that originally sets other events in motion" *Id.* (quotations omitted). Thus, in the context of interpreting an exclusionary provision in an insurance policy which does not contain an anti-concurrent or anti-sequential clause, the Court must look to "the most direct and obvious [efficient] cause" of an insured's loss" rather than attempt to "trace events back to their metaphysical beginnings." *Id.* (alterations in original) (quotations omitted). In so doing, the Court must ask "whether the parties contemplated that the exclusion would apply in a circumstance such as that presented in light of the reasonable expectation and purpose of the ordinary business person when making an ordinary business contract." *100 Orchard St.*, 2021 WL 2333244, at *2 (quotations omitted).

8

Here, the Contamination Exclusion does not contain an anti-sequential or anti-concurrent clause. This does not mean, however, that the Contamination Exclusion is inapplicable simply because some specific event other than the outbreak of COVID-19 was the last in a series of events which lead to the closure of Plaintiffs' businesses. Rather, it is clear that the singular event which is directly responsible for, and therefore the efficient proximate cause of, Plaintiffs' losses is the outbreak of COVID-19. Indeed, neither the government shutdown or closure orders nor the presence of an infected person on Plaintiffs' premises would have occurred absent the spread of COVID-19. To that end, as courts in New York, this district, and around the country have consistently found, a reasonable business person would unquestionably anticipate that a provision which excludes coverage for "any condition of property that results from a . . . virus" and any cost thereof would also apply to any such costs or conditions of property that result from "the immediate efforts to mitigate a viral outbreak." *100 Orchard St.*, 2021 WL 2333244, at \*2; *see also Mayssami Diamond, Inc v. Travelers Cas. Ins. Co. of Am.*, No. 3:20-cv-01230-AJB-RBB, 2021 WL 1226447, at \*4 (S.D. Cal. Mar. 30, 2021); *Causeway Automotive, LLC v. Zurich Am. Ins. Co.*, No. 20-8393 (FLW) (DEA), 2021 WL 486917, at \*4 (D.N.J. Feb. 10, 2021).

### iv. Defendant is Not Estopped From Denying Coverage Under the Contamination Exclusion

Finally, the Court finds Plaintiffs' argument that Defendant is estopped from invoking the Contamination Exclusion to deny coverage for Plaintiffs' claim similarly unpersuasive. The doctrine of regulatory estoppel prevents an insurer from advancing an interpretation of an exclusion to insurance coverage in litigation that is inconsistent with representations it made regarding the scope and meaning of that exclusion to state insurance regulators when initially seeking its approval. *See Benamax Ice, LLC v. Merchant Mut. Ins. Co.*, – F.3d –, 2021 WL 1171633, at \*6 (D.N.J. Mar. 29, 2021).

The Court notes that there is an apparent conflict between New York and New Jersey law with respect to the doctrine of regulatory estoppel which Plaintiffs do not address. Although New Jersey courts have recognized the doctrine in certain contexts, *see Morton Int'l v. Gen. Accident Ins. Co.*, 629 A.2d 831 (N.J. 1993), it is unclear whether New York has done the same, *see Sher v. Allstate Ins. Co.*, 947 F. Supp. 2d 370, 389 (S.D.N.Y. 2013). The Court need not resolve this conflict, however, because even assuming the doctrine of regulatory estoppel were theoretically available with respect to Plaintiffs' claim, it would not work to prevent Defendant from relying on the Contamination Exclusion to deny coverage for at least two reasons. First, as the Court has already noted, the Contamination Exclusion is clear and unambiguously applies to bar coverage for Plaintiffs' losses, and "regulatory estoppel does not void clear and unambiguous provisions or provide a basis for recission." *Mattdogg, Inc. v. Phila. Indem. Ins. Co.*, No. L-820-20, 2020 WL 7702634, at \*4 (N.J. Super. Ct. Law Div. Nov. 17, 2020)[4]; *see also Sher*, 947 F.

---

[4] *Mattdogg* is the only decision by a New Jersey court of which the Court is aware that considered

Supp. 2d at 389 (noting that New York's parol evidence rule barring consideration of extrinsic evidence to contradict an unambiguous contract provision "counsels against adoption of a regulatory estoppel" claim).

Second, Plaintiffs have not alleged any inconsistency or misleading statement made by Defendant to state regulators with respect to the Contamination Exclusion. The Complaint alleges that Defendant told state regulators that the Policy itself did not cover losses resulting from disease-causing agents and that the Contamination Exclusion was simply an explicit clarification of that understanding. Compl. ¶ 104. Whether or not that understanding of the scope of the Policy was itself accurate is irrelevant. The fact of the matter is that Defendant's current litigation position is entirely consistent with the alleged position it took in front of state regulators: the Policy does not cover loss or damage resulting from contamination.

### 4.     Plaintiffs Have Not Alleged Physical Loss or Damage

Even if the Court were to conclude that the Contamination Exclusion was, for some reason, not applicable to Plaintiffs' claim for coverage, Plaintiffs still have not adequately stated a claim for relief under the Policy. In order for coverage to be available under the Policy, including coverage under the Time Element section and the various extensions thereof, Plaintiffs must be able to demonstrate that their property or certain nearby properties suffered some direct physical loss or damage. Compl., Ex. A at 45, 75. Plaintiffs argue that they have adequately alleged the requisite physical loss or damage by alleging that (1) the government closure orders resulted in the loss of use of Plaintiffs' insured property; and (2) the presence of COVID-19 itself physically damaged or rendered unusable Plaintiffs' insured property. Neither argument is persuasive.

As an initial matter, New York courts have consistently held that the phrase "physical loss or damage" in an insurance policy requires "actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure." *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014); *see also Food for Thought Caterers Corp. v. Sentinel Ins. Co.*, – F.3d –, 2021 WL 860345, at *3 (S.D.N.Y. Mar. 6, 2021) (collecting cases). As such, New York courts have overwhelmingly rejected the argument that the loss of use of insured property due to COVID-19-related government closure orders constitutes "direct physical loss or damage" for purposes of insurance coverage. *See Off. Sol. Grp.*, 2021 WL 2403088, at *7 (noting that "New York courts have consistently maintained that 'direct physical loss of or damage' language required physical damage to invoke coverage, and that loss of use due to the pandemic does not constitute physical damage when the covered property was physically unharmed by the virus" and collecting cases); *see also 6593*

---

the application of regulatory estoppel to an insurer's invocation of an exclusion that would bar coverage for losses related to COVID-19.

*Weighlock Drive, LLC v. Springhill SMC Corp.*, – N.Y.S.3d –, 2021 WL 1419049, at *5 (Sup. Ct. Apr. 13, 2021) (same).

New York courts have similarly rejected the argument that the physical presence of COVID-19 on an insured premises constitutes "physical loss or damage." Though Plaintiffs are correct that physical loss or damage does not need to be "tangible, structural or even visible" to trigger coverage, there must still be "some compromise to the physical integrity" of the insured premises. *Newman*, 17 F. Supp. 3d at 329-330. Courts have often looked to the nature of a potentially hazardous condition and the extent of remediation necessary to remove that condition in determining whether it constitutes "physical loss or damage." *See Sharde Harvey, DDS, PLLC v. Sentinel Ins. Co.*, No. 20-CV-3350 (PGG) (RWL), 2021 WL 1034259, at *9-10 (S.D.N.Y. Mar. 18, 2021) (Lehrburger, Mag. J., Report & Recommendation). To that end, courts have distinguished between cases involving, for example, the discharge of ammonia gas or the presence of large quantities of asbestos, which may constitute direct physical loss or damage, and those involving the contamination by a virus such as COVID-19, which does not. *Id.* While the former category of cases concern conditions that render a premises inherently dangerous for human occupation which can only be removed through "non-routine, extensive remediation," the latter form of contamination does not pose a risk to the integrity of the property itself and "can be eliminated by routine cleaning and disinfecting." *Id.*; *see also 100 Orchard St.*, 2021 WL 2333244, at *1 & n.5 (collecting cases); *Mangia Restaurant Corp. v. Utica First Ins. Co.*, – N.Y.S.3d –, 2021 WL 1705760, at *4 (Sup. Ct. Mar. 30, 2021).[5]

The Court agrees with and adopts the reasoning of the courts that have considered this issue under New York law. Neither the government closure orders nor the presence of COVID-19 itself constitute "direct physical loss or damage" or an imminent threat thereof within the meaning of the Policy. Accordingly, Plaintiffs have failed to satisfy their burden that their claim is within the scope of coverage provided by the Policy.

### B. Count III: Bad Faith

Plaintiffs' claim for bad faith denial of insurance coverage must also be dismissed. Though the parties do not discuss whether New York or New Jersey law applies to this claim, the Court finds that Plaintiffs' claim fails under the law of either state. First, "New York does not recognize the tort of bad faith denial of insurance coverage." *Core-Mark*

---

[5] For this reason, Plaintiffs' reliance on *Pepsico, Inc v. Winterthus Int'l Am. Ins. Co.*, 24 A.D.3d 743, 744 (N.Y. Sup. Ct. App. Div. 2005) is misplaced. There, the court concluded that the use of faulty raw ingredients which rendered certain beverage products unmerchantable constituted "physical damage" because "the product's function and value have been seriously impaired, such that the product [could not] be sold." *Id.* at 744. However, unlike the ingredients used to create a product, COVID-19 itself has not altered the physical function or value of the Plaintiffs' property and, as noted, does not constitute "physical loss or damage" or create a risk thereof. *Buffalo Xerographix, Inc. v. Sentinel Ins. Co.*, No. 1:20-cv-520, 2021 WL 2471315, at *4 (W.D.N.Y. June 16, 2021).

*Int'l Corp. v. Commonwealth Ins. Co.*, No. 05-Civ.-183 (WHP), 2005 WL 1676704, at *3 (S.D.N.Y. July 19, 2005).

Second, under New Jersey law, to state a claim for bad faith denial of insurance coverage, Plaintiffs were required to show that: "(1) [Defendant] lacked a reasonable basis for its denying benefits, and (2) [Defendant] knew or recklessly disregarded the lack of a reasonable basis for denying the claim." *Nationwide Mut. Ins. Co. v. Caris*, 170 Supp. 3d 740, 748-49 (D.N.J. 2016). A denial of coverage is, by definition, not made in bad faith where the claim itself is "fairly debatable." *See id.* Here, because the Court has already determined that Plaintiffs' claim was not, as a matter of law, covered under the Policy, it stands to reason that Plaintiffs' claim was "fairly debatable" and Defendant's denial of coverage therefor was reasonable.

### C.     Count IV: NJCFA

Finally, the Court concludes that Plaintiffs' claim under the NJCFA must also dismissed. Even assuming the NJCFA applied to Plaintiffs' insurance relationship with Defendant embodied in a contract governed by New York law, Plaintiffs have failed to state a proper claim under the NJCFA. "[W]hile the CFA 'encompass[es] the sale of insurance policies as goods and services that are marketed to consumers,' it was not intended as a vehicle to recover damages for an insurance company's refusal to pay benefits." *Myska v. N.J. Mfrs. Ins. Co.*, 440 N.J. Super. 458, 485 (Super. Ct. App. Div. 2015) (quoting *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 265 (1997); *see also Caris*, 170 Supp. 3d at 746-47. Here, the entirety of the allegations related to Plaintiffs' NJCFA claim concern Defendant's handling, investigation, and subsequent denial of Plaintiffs' claim for insurance coverage as opposed to the initial sale or marketing of the Policy. As such, Plaintiffs' have failed to state a plausible claim for relief under the NJCFA and Count IV must be dismissed.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion is **GRANTED**. An appropriate order follows.

        /s/ *William J. Martini*
        **William J. Martini, U.S.D.J.**

**Date: August 26, 2021**